**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

ANA EVERETT and DONNA CHILDRESS,      :
:
    Plaintiffs,      :
:
v.      :
:      CIVIL ACTION FILE
GRADY MEMORIAL HOSPITAL      :      NO. 1:15-CV-173-SCJ
CORPORATION d/b/a GRADY HEALTH      :
SYSTEM, and STEPHANIE SHAW,      :
:
    Defendants.      :

## ORDER

This matter is before the Court on Defendants' motion for partial summary judgment as to Plaintiff Childress's claims [61]; Defendants' motion for summary judgment as to Plaintiff Everett's claims [62]; Plaintiff Childress's motion for leave to file response [77]; Plaintiff Everett's motion for leave to file sur-reply [80]; and Plaintiff Everett's motion for leave to file response [81].

**I.      Background**

    **A.      Procedural History and Facts**

Plaintiffs, Anna Everett and Donna Childress, filed suit against Defendant, Grady Memorial Hospital Corporation, on January 20, 2015, alleging Defendant violated their rights under the Fair Labor Standards Act ("FLSA"). Plaintiffs

subsequently amended their complaint twice to add Defendant Stephanie Shaw and claims on behalf of Plaintiff Everett for retaliation under the FLSA, Title VII pregnancy discrimination, and failure to accommodate under the Americans with Disabilities Act. The parties engaged in discovery and Defendants filed the instant motions for summary judgment.

1.   Everett

Everett began working for Grady Hospital in 2001 and became the Program Manager of Grady's car seat program in 2005. See DSMUF, ¶ 1. Everett continues to hold this position. Id., ¶ 2. Originally, the cost of Grady's car seat program was covered by a grant from the Robert Wood Johnson Foundation and the Governor's Office of Highway Safety. At the end of 2012, however, the grant was not renewed, but Grady continued the Car Seat Program for its own patients and funded the Program, including Everett and Childress's salaries, through its own budget. See PSAF, ¶¶ 8-9 & Resps.

Everett reported to Director Sandra Sanchez in 2012; Vice President Lindsay Caulfield from October 2012 through December 2013; Michelle McIntosh, Senior Staff Nurse, for three months in 2014; and Stephanie Shaw,

Practice Manager for Women's Health from summer 2014 through 2015.  See DSMUF, ¶ 4.

Everett's job description lists her duties as "directs and provides administrative leadership" to the Injury Free Coalition for Kids and managing Grady's Childbirth Education program. Id., ¶ 6.  The essential duties of the job include reorganizing, designing, and implementing the Childbirth Education program; managing bilingual occupant safety program; hiring and training staff for program certifications; developing program materials; coordinating child passenger safety training; and preparing all required documentation relating to the program.  Id., ¶ 7.  Everett's primary duties include distributing car seats; administering the Grady car seat program, directing and providing administrative leadership, developing program materials, attending management meetings at Grady, assigning duties, supervising Donna Childress and program volunteers, preparing reports, seeking grants, and conducting educational activities. Id., ¶ 8.

Everett testified that she is responsible for making sure that the educational courses are taught and that car seats are distributed to qualifying Grady patients; she made the decision to commit Grady to supplying car seats

3

to non-Grady organizations and decided the number of car seats to take to various events; she is responsible for evaluating Childress's job performance; she recommended Childress for a promotion from health educator to program coordinator; she is responsible for putting together documentation to renew the original grant and signed off on original grant documents as Project Director; she seeks out new grants and funding, works on task forces for childbirth education, and attempts to obtain reimbursement from government agencies for Grady's program. Id., ¶¶ 9-15.

Everett attends quarterly management training meetings, called the Leadership Development Institute, which is a program to develop management skills open only to Grady managers and supervisors. Id., ¶ 16. Everett obtains lists of outside events sponsored by various organizations and determines which events she and Childress will attend. Id., ¶ 17. Everett has worked with Vice President Baker to develop a workflow plan for the distribution of car seats and with Grady's legal department and the National Coalition liaison, Dr. McFadden, to outline and implement a car seat policy. Id., ¶¶ 18-19.

From at least 2012 through January 2015, Everett's managers worked in a separate building from Everett or in a different wing of the hospital. Id., ¶ 20.

4

Everett is classified as an exempt employee. She earns over $71,000 per year and is paid the same weekly salary regardless of the number of hours she works per week. Id., ¶¶ 21-23.

All nonexecutive employees at Grady are required to use a time clock. Id., ¶ 24. Everett understands that Grady requires every employee to record time by swiping a card when entering and exiting the hospital. Id., ¶ 25. Employees who forget to log in or out or work off the clock are required to inform their supervisors so that their time may be accurately recorded. Id., ¶ 26. Everett was required to notify her manager whenever she failed to clock in or out so the manager could enter the time into Grady's timekeeping system. Id., ¶¶ 27-28.

Everett does not know whether her time was reported accurately. Id., ¶ 30. During the time period relevant to this lawsuit, Everett never reported to anyone at Grady that she believed she was owed overtime compensation. Id., ¶ 31. No one ever instructed Everett that she should not report hours that she worked. Id., ¶ 32. Everett does not know how many hours she may be owed for overtime. Id., ¶ 33.

Grady has a lunch break policy that applies to non-exempt employees. Under that policy, 30 minutes for a meal break is automatically deducted from

5

each employee every day that employee works 4.5 hours or more.  Id., ¶ 34.

Employees who work through their meal break are required to be compensated

and employees are responsible for notifying their manager if they worked

through the meal break.  Id., ¶ 35.  Other employees who report to the same

managers that Everett does have requested compensation for working through

their meal breaks and Everett's managers have corrected the time records so that

those employees are compensated for the additional time.  Id., ¶ 38.

Grady also has an on-call policy which provides that employees do not

receive credit for the time they are waiting to be called back to the hospital.  Id.,

¶ 39.[1]  While on-call, Everett could perform personal activities, such as attending

a baseball game or going to lunch.  There was no set amount of time within

which she had to return to the hospital if she were called into work.  Id., ¶¶ 44-

45.  Everett and Childress alternated on-call weekends and if they were called

in, generally it was so they could speak with new parents being discharged and

provide them with car seat safety information or a new car seat.  See PSAF, ¶¶

28-29.  While on-call, if they were required to return to the hospital, employees

---

[1]Plaintiff disputes this statement but provides no citation to the record for her assertion that Grady's on-call policy requires an employee to be paid $4.50 per hour for the time he is waiting to be called back to the hospital.  See Resp. DSMUF, ¶ 39.

would be compensated for the actual time they worked.  During 2013 through January 2015, there are time records for Everett which show actual time she worked when she was called into the hospital from on-call status.  <u>See</u> DSMUF, ¶ 46.[2]

For hours an employee works off-the-clock at events away from Grady, Grady policy requires the employee to log in and log out so that there is a record of the time the employee worked.  <u>Id.</u>, ¶ 48.  If Everett did not log in or out, she was to notify her manager so that a time correction could be entered.  <u>Id.</u>, ¶ 49. Everett was never told to work off-the-clock and no one instructed her not to report the time she worked, but Everett testified that "Grady . . . required" that she work such events, "Grady" knew she was working events, and that she was on-call on the weekends.  <u>Id.</u>, ¶ 50 & Resp.; PSAF, ¶¶ 21-26.

Everett does not know whether she reported any off-the-clock work during the three years in which she seeks overtime.  <u>See</u> DSMUF, ¶ 52.  During 2013 and 2014, Everett's managers required prior approval in order for Everett to attend non-Grady events and required that Everett report any time she worked at these

---

[2]While Plaintiff disputes those records show all of the time she actually worked when on-call, she does not dispute that some portion of that time is reflected.  <u>See</u> Resp., DSMUF, ¶ 46.

non-Grady events.  Everett testified that she did report such non-Grady events to her managers.  Id., ¶ 53.

Everett was paid the same weekly compensation regardless of how many hours she worked, but in the early years of her employment, the grant Grady received was structured to compensate Everett for 32 hours of work per week. Id., ¶ 93 & Resp.  Everett and Childress worked Monday through Thursday and were on-call on alternate weekends.  See PSAF, ¶ 32.  As such, Everett and Childress sometimes worked more or less than the 32 hours per week.  Id., ¶ 31. Everett, however, understood that she would receive the same weekly salary regardless of the number of hours she worked each week.

It is Defendants' position that Everett was to, and did report, all of her time and that her time records accurately reflect her hours worked.  It is Everett's position that Grady's time records do not include all of her weekend work and on-call work.  See PSAF, ¶ 37 & Resp.  During her deposition, Everett did testify that she is not sure if she worked any time that is not reflected in her Time Summary Report.  Id. (citing Everett Depo., p. 335 ("I can't tell you what is accurate and what is inaccurate.  Because I don't know.").  She also testified that

8

when she failed to log in or log out, she was supposed to notify her manager so a time correction could be made.  Id.

In early 2015, Everett requested permission to engage in intermittent FMLA leave from February to August 2015 and presented a note from her obstetrician stating she had a high-risk pregnancy and would need periodic time off.  See DSMUF, ¶ 96; PSAF, ¶¶ 72-73.  The leave request was granted in February 2015.  See DSMUF, ¶ 96; PSAF ¶ 78.  On April 28, 2015, Everett presented another doctor's note requesting "light duty."  See PSAF, ¶ 79.  Everett stated that although her doctor wanted her on bed rest, he agreed to allow her to try to work at her desk with her feet up.  Id.

Shortly thereafter, on May 4, 2015, Everett presented a doctor's note stating that she was unable to lift and could stand/walk only 15 minutes per hour.  See DSMUF, ¶ 97; PSAF, ¶ 80; ¶ 120-21.  Shaw, Everett's supervisor at the time, determined that based on these new limitations, Everett could not perform the essential functions of her job, including standing to teach class, lifting car seats weighing 15 pounds, walking to visit patients on other floors in the hospital, delivering car seats to patients, and supervising the car seat program, Childress, and the program volunteers.  See DSMUF, ¶ 98 & Resp.

9

Everett disagrees with Shaw's assessment of her essential job functions and testified that she spent most of her time behind a desk at her computer and therefore could work even with these medical restrictions. <u>See</u> PSAF, ¶¶ 65-67, 103-05. Ultimately, Everett was informed that her department would not be able to accommodate her restrictions, that she had six weeks of FMLA leave available to her, and that she "will have to go out on continuous leave of absence with effective date of 5/5/2015 until you can return full duty." <u>Id.</u>, ¶ 84. Everett interpreted that to mean that she would be terminated at the end of six weeks. <u>Id.</u>, ¶ 90.[3]

Because Shaw did not believe that Everett could complete her essential job duties with these restrictions, Shaw instead placed Everett on FMLA leave. <u>See</u>

---

[3]In her Statement of Facts, Everett proffers a great many statements derived from the deposition testimony of Grady leave coordinator and human resources employee, Kenda Bryant. <u>See</u> PSAF, ¶¶ 74-77, 91, 93-101, 106-20, 125-26, 130-39, 141-43, 178-85 and Resps. However, while Ms. Bryant did handle FMLA paperwork she did not have any responsibility for issues relating to Title VII, the ADA, the Pregnancy Discrimination Act, or decisions about medical accommodations. Ms. Shaw (with Human Resources Director Carolyn Hughes-Stephens and General Counsel Timothy Jefferson) made the decision that Everett's job requirements would not allow her to work from home. <u>See</u> PSAF, ¶ 188; Shaw Depo., at pp. 110-11. Ms. Bryant did not make that decision and therefore whatever she may or may not have known about Everett's job, the possible accommodations, or Ms. Shaw's decision-making process, is not relevant Everett's claims.

DSMUF, ¶ 99.  Citing this decision, Everett amended her complaint to add causes of action based on her belief that she could perform her job duties even with the limitations described by her physician.  Id., ¶ 100.  On May 22, 2015, Grady then offered Everett the opportunity to return to her job with the restrictions noted by her physician.  Everett would receive compensation for all days missed and any used FMLA leave would be restored.  Id., ¶ 101; PSAF, ¶ 140.  Everett turned down this offer on May 26  because she did not "want to risk miscarriage" and her doctor decided she should not return to work.  See DSMUF, ¶¶ 102-03.

On June 16, 2015, Everett presented another doctor's note which stated she had an incompetent cervix and should work from home.  Id., ¶ 105; see PSAF, ¶ 164.  Defendant determined that due to the essential job functions of Everett's job – such as teaching courses, observing and managing other employees in the car seat program, and meeting with patients – she could not work from home full time.  See DSMUF, ¶¶ 106-07.  Shaw also had concerns about Everett's ability to remotely access Grady Hospital's confidential intranet system to confirm patient information and documentation.  See PSAF, ¶ 189. Everett testified that she did not know of any other employee Shaw permitted to telecommute.  See DSMUF, ¶ 108. Everett, however, again disagreed with Shaw's assessment of the essential

functions of the job and believed that she could perform her job from home full time.  Everett also notes that under "Job Requirement," her position states "[t]ele-working from home other location, on-call, and flex scheduling required."  <u>See</u> PSAF, ¶ 159.

Fran Baker-Witt, Executive Director of Women and Infant Services at Grady, testified in her deposition that "the challenge [with Everett potentially working from home] is that her – what her essential functions are with the car seat and the classes, required her to really be there.  And it would require shifting additional responsibilities onto other people which in my opinion wouldn't have been fair because she is the manager of the program.  So my preference would be for her to be on site to manage the program as well as the people that reported to her."  <u>See</u> Baker-Witt Depo., at 54-55.  Ms. Baker-Witt testified that it would be possible for her to do "home part-time and work[] at the office part-time" for a "short period of time."  <u>Id.</u> at 55-56.

After Everett delivered her baby, her doctor stated she could not work because of postpartum recovery and high blood pressure.  <u>See</u> DSMUF, ¶ 111.  Although Everett's FMLA leave expired in July, she was permitted to remain on

leave after her delivery and through her postpartum recovery until her return to Grady on October 8, 2015.  Id., ¶ 104.

2.    Childress

Childress started working at Grady Memorial Hospital in December 2005 as a health educator.  See DSMUF, ¶ 1.  Childress was hired after Grady received a grant from the Governor's Office of Highway Safety to educate patients on child safety and to distribute car sears.  Id., ¶ 3.  Childress's primary job duties were to distribute car seats to mothers who were patients at Grady Hospital and to provide education on placing a child into the car seat.  Id., ¶ 4.

The manager of Grady's car seat program was Ana Everett.  Id., ¶ 6.  In 2012, Everett reported to Sandra Sanchez, Director.  Id.,. ¶ 7.  From October 2012 to December 2013, Senior Vice President Lindsay Caulfield supervised Everett and Childress.  Id., ¶ 8.  From January 2014 to March 2014, Michelle McIntosh, Senior Staff Nurse for Women's Health replaced Caulfield and in summer 2014, Stephanie Shaw replaced McIntosh.  Id., ¶ 9.  Beginning in October 2012, Everett no longer maintained Childress's time records.  See PSAF, ¶ 13 Resp. Subsequently, Caulfield, McIntosh, and Shaw performed that task.  Id.

All nonexecutive employees at Grady "clock in" and "clock out" by swiping an identification card when they arrive and leave work. See DSMUF, ¶¶ 11-13. Childress was required to notify her manager whenever she failed to clock in or out so the manager could enter her correct time. Id., ¶ 14. Grady has submitted the time records for Childress from 2012 through January 2015. Id., ¶ 16. Although Childress contends that these time records do not contain all of the hours worked by Childress, she agrees that she has no documents or evidence to indicate that the number of hours in Grady's Time Summary Report for her is incorrect. Id., ¶ 16 Resp. & ¶ 17. Childress has no documentation that would show if she worked more than 40 hours per week. Id., ¶ 20. Childress has not made an estimate of the number of overtime hours she claims she is owed from 2012 through January 2015. Id., ¶ 21. She does not know how many weeks she worked more than 40 hours a week from 2012 through 2015. Id., ¶ 22. Childress testified that no one at Grady told her not to report all hours worked. Id., ¶ 25.

Grady has a written policy concerning lunch breaks which states that a 30 minute meal break is deducted from all employees each day an employee works 4.5 hours or more. Id., ¶ 26. The policy provides if that an employee works

through her lunch break, she is responsible for notifying her manager so she can be paid for that time.  Id., ¶¶ 27-28.  Childress testified that she often worked through lunch with her manager, Everett.  Id., ¶ 30 Resp.  She also testified that she was not aware of the lunch break policy and did not believe it applied to her because she was classified as an exempt employee.  Id.,¶¶ 26-28 Resp.

Under Grady's on-call policy, employees do not receive credit for the time they are waiting to be called back to the hospital.  Id., ¶ 32.  The policy provides that employees who are required to return to work receive compensation for the time they actually work.  Id., ¶ 33.  During 2012, when Childress was on-call, her time entries show that Everett entered a 12 hour block showing an in time of 7:30 a.m. and an out time of 7:30 p.m. and that Childress did not sign in at the hospital during that time.  Id., ¶ 35.  Childress testified that she could not recall what the 12 hour time entries were for and she could not recall any work she performed during those 12 hour on-call designations.  Id., ¶¶ 36-37.  During 2013 through January 2015, Childress's managers Caulfield, Macintosh, and Shaw did not enter 12 hours on the time records when Childress was on call.  Id., ¶ 38. Caulfield, McIntosh, and Shaw testified that they entered actual time Childress worked when she was on-call.  Id., ¶ 38.  Everett testified that she did not always

add in Childress's on-call work because she did not believe it was necessary as she did not believe Childress would be compensated for that time. Id., ¶ 38 Resp. But Childress testified that if she went to the hospital, it would be reflected on her time records because she had to clock in. Id., ¶ 40. When she was on-call, Childress had no specific time within which she had to be able to report back to the hospital. Id., ¶ 41. She could go to church, dine out, take her children to events, etc. Id., ¶ 43. Childress understood that if she worked on a weekend, she was responsible for reporting her time. Id., ¶ 44.

During 2012, Childress attended weekend events to assist with car seat distribution and education as part of the Georgia grant program. Id., ¶ 45. These events were sponsored by the Atlanta Fire Department, the National Coalition for Injury Free Kids, and other organizations. Id. Childress provided Sanchez with monthly calendars showing the dates of these events. Id., ¶ 46. Sanchez required Childress to identify time she actually worked if she attended any events scheduled during the time she was on-call. Id., ¶ 48. Other than Everett, no Grady manager attended these events. Id., ¶ 50. Other than Everett, no one from Grady instructed Childress to attend these events and Childress did not inform her managers that she attended these events. Id., ¶ 51. During 2013 and

2014, other than Everett, no Grady manager authorized Childress to attend these events and Childress did not seek prior approval to attend these non-Grady events. Id., ¶ 52.

Childress also testified that she participated in telephone calls and meetings away from Grady for organizations such as the National Coalition for Injury Free Kids, a voluntary organization. Grady was one of the National Coalition's numerous members throughout the United States. Id., ¶¶ 54-55. Childress was not authorized by anyone at Grady to perform services for the National Coalition. Id., ¶ 56. Other than Everett, none of Childress's managers was aware of or authorized any activities away from Grady on behalf of the National Coalition. Id., ¶ 57. Childress and Everett believed that because Grady was a member of the National Coalition, any work they did for the National Coalition was worked they performed for Grady. Id., ¶ 56 Resp. Other than to Everett, Childress never reported to any of her managers that she participated in telephone conferences with the National Coalition. Id., ¶ 58. She never reported hours involved in time she spent on these off-the-clock activities with the National Coalition. Id., ¶ 59. Sanchez, Caulfield, McIntosh and Shaw were not aware of the unreported time Childress claims she worked. Id., ¶ 62.

Childress understood that she would receive the same salary regardless of the number of hours she worked each week. Id., ¶ 83. She received the same salary whether she worked 28 hours or 50 hours per week. Id., ¶¶ 83-84. Childress was aware that she did not have any deductions in pay taken when she worked partial days. Id., ¶ 85. Childress has no evidence that anyone at Grady knew or believed that the manner in which she was being compensated was prohibited by law. Id., ¶ 87.

**B.    Contentions**

With respect to the claims of Plaintiff Everett, Defendants argue that Everett is not entitled to overtime under the Fair Labor Standards Act because she falls under the Act's administrative exemption. Defendants state Everett has not proffered sufficient evidence on her claim of retaliation under the Fair Labor Standards Act because her causation evidence does not have close temporal proximity. Defendants also contend that Everett cannot make out a prima facie case of pregnancy discrimination because she has offered no similar non-pregnant comparator who was granted the accommodations requested by Everett. Finally, Defendants argue that Everett cannot succeed on her claim of discrimination under the ADA because she cannot perform the essential

18

functions of her job with or without a reasonable accommodation and therefore is not a "qualified individual" and because she cannot show Defendants discriminated against her.

Everett responds that she is entitled to overtime under the FLSA because she is not an exempt employee under the administrative exemption as her primary job duties relate to customer service for patients of Grady. She contends that Defendants retaliated against her for filing a claim under the FLSA because Defendants denied her request to work from home during her pregnancy and "forced" her on unrequested, unpaid medical leave. Everett contends that Defendants' denial of her request was pretextual because she could perform her essential job functions from home. She avers that Defendants discriminated against her on the basis of her pregnancy and/or disability because her request to work from home for the duration of her pregnancy was reasonable and she could perform the essential job functions from home.

With respect to the claims of Plaintiff Childress, Defendants argue that appropriate statute of limitations for Childress's claims is two years because she cannot show that any violation of the FLSA that occurred was "willful." Defendants also contend that Childress cannot show she is entitled to

compensation for unreported work during meal breaks, on-call time at home, and off-the-clock hours for events that were unreported and of which Grady had no knowledge because Childress cannot identify the days or hours she worked any alleged overtime and cannot show that her managers were aware of any overtime she worked. To the extent that Childress is owed any overtime compensation, Defendants aver that the damages should be calculated on the basis of the fluctuating work week method.

Childress responds that because Defendants did not move for summary judgment on Childress's misclassification, Defendants admit that Childress should not have been paid as an exempt employee. Childress avers that the Court should apply the three year statute of limitations because whether Defendants acted willfully is a question for the jury. Childress argues she is entitled to overtime hours because Everett, her immediate supervisor, was aware of her on-call, weekend, and off-the-clock work. Childress contends that she is entitled to time and a half for any overtime hours worked and not just one-half the regular rate as suggested by Defendants' reference to the fluctuating work week.

## II.    Discussion

A.      **Preliminary Matters**

Before considering the three declarations Plaintiffs provided in response to Defendants' motions for summary judgment, the Court notes that the point of discovery is to flesh out all of the relevant facts known by the parties.  Once discovery is completed, the parties file motions for summary judgment which are to highlight for the Court the facts necessary to make legal determinations or argue to the Court that there are true material disputes of fact that can only be resolved by the finder of fact and therefore cannot be determined on summary judgment.  That is not what happened in this case.

Rather, after both Plaintiffs sat for lengthy depositions, they also both provided lengthy declarations in response to Defendants' motions for summary judgment.  Moreover, Everett provided a declaration not only for her own case, but also another declaration for Childress, resulting is a substantial overlap of testimony.   Defendants filed objections to nearly every paragraph in these declarations, including those paragraphs repeated among the three declarations. This practice has exponentially increased the time required by the Court to adjudicate the motions.  See, e.g., Brantly v. Ferrell Elec., Inc., 112 F. Supp. 3d 1348, 1354 (S.D. Ga. 2015) ("The parties have expended a great deal of time and

energy filing and responding to these [declarations and motions to strike declarations], which many courts have described as 'time wasters.'"); id. at 1355 ("The Court is capable of reviewing the relevant evidence, as required by the summary judgment standard and other binding precedent, without resorting to an exclusionary process.").

Furthermore, in response to both motions for summary judgment, Childress and Everett each submitted lengthy "statements of material fact." Local Rule 56.1, however, does not contemplate that a respondent to a motion for summary judgment submits her own full statement of material facts. Rather, Rule 56.1 provides a respondent may submit a "statement of **_additional_** facts which the respondent contends are material and present a genuine issue for trial." LR 56.1(B)(2)(b), NDGa (emphasis added). The additional facts presented by the respondent must relate to why the respondent believes there is a genuine issue for trial. Here, unfortunately, a significant number of Childress's and Everett's "statements of material fact" simply repeat what Defendants recited in their own statement of facts. This manner of litigation has substantially added to the Court's burden in discerning the undisputed and disputed facts. The Court does not condone any of these practices.

22

1.     <u>Objections to Everett's Declaration on Everett's Behalf</u>

In response to Defendants' motion for summary judgment on her claims, Plaintiff Everett submitted a declaration.  Defendants then filed a notice of objections to portions of this declaration.  Everett has responded to those objections.[4]  The Court reviews the objections on a paragraph-by-paragraph basis.

In Paragraph 8 of her declaration, Everett testifies that "my essential job functions were administrative functions requiring me to sit and work on a computer." <u>See</u> Everett Decl., ¶ 8.  Defendants object to this testimony stating that Everett's deposition testimony, job description, and the declarations of her managers "show that duties extend far beyond her characterization." <u>See</u> Doc. No. [76], pp. 1-2.   As there is no direct contradiction between Everett's declaration and her prior testimony, there is no basis to strike this paragraph. The Court is required to review the entirety of the evidence in ruling on Defendants' motions for summary judgment.  As such, Plaintiff's prior deposition testimony is viewed alongside with her newer characterization of her job.

---

[4]The Court GRANTS Plaintiff Everett's motion for leave to file response [81].

Everett testifies that Grady "required" her to attend events throughout Georgia as part of her job. See Everett Decl., ¶ 9. Defendants object to Everett's use of "Grady" as Everett has not identified any particular individual who required her to attend these events and each of Everett's managers testified that attending these events was not part of her job and could only be done with prior approval and a requirement that Everett report her time at these events. Again, the Court will consider Everett's testimony on this point with the credit it is due. In particular, the Court notes that Everett's general testimony cannot dispute the managers' specific testimony that prior approval was required for these events; nor does it dispute the testimony of each individual manager that these events were not required.[5]

Everett testified that throughout her "employment, I have been repeatedly told by various managers that because I was a salaried, exempt employee, it did not matter what my time records said because I was salaried. We were often told it was not necessary to clock out depending on the manager because we would only be paid for eight hours per day." See Everett Decl., ¶ 12. Defendants object

_____

[5]Everett points out that Fran Baker-Witt testified that she was aware that Everett would attend events on the weekend. See PSAF, ¶¶ 52-55. But Ms. Baker-Witt was not one of Everett's time managers and did not know how many events Everett attended. See PSAF, ¶¶ 52-55 & Resps.

that any statement made by an unidentified manager is hearsay. Everett responds that as an employee for over ten years she is "perfectly qualified to testify as to the routine practices at the hospital." See Doc. No. [81], p. 4.

Neither party addresses the crux of the problem. The Court may consider hearsay on a motion for summary judgment so long as it is possible to reduce the hearsay to an admissible statement at trial. See Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999). The problem here is not that Everett's statement may contain hearsay, it is that without the identification of any manager who may have so instructed Everett, such testimony cannot be reduced to admissible evidence at trial. Everett is correct that she could testify as to her experience as an employee at Grady Hospital, but the relevant legal point of Everett's testimony surrounds whether her manager knew or should have known she was working additional hours that might be overtime hours. Everett's position that this was "routine practice" of the hospital, alone, is not a sufficient basis for such a finding. If Everett cannot identify a particular manager who instructed her it was not necessary to clock out, her testimony cannot be the basis for a finding that Everett's managers knew she was working overtime, particularly in light of the testimony of each of her managers that she did not give this instruction to Everett.

25

The Court applies the same reasoning to Everett's testimony in Paragraph 13 of her declaration where she testifies that there was a practice of "get your hours" for salaried employees such that once they got to forty hours for the week, no one documented any additional hours and that the "Time Correction Form" was not "typically" used for salaried, exempt employees.  See Everett Decl., ¶ 13.  Everett also stated that "[a]lthough my time records do not reflect all hours worked, Defendant Grady was aware of the time I was working including the weekend on-call time and event participation."  Id.  As the Court explained above, "Defendant Grady" alone cannot be aware of the fact of Everett working.  A corporation acts through its employees and Everett has not identified any manager who was aware that Everett was not recording her time. Similarly, the fact that Everett testified she would discuss weekend events at staff meetings and provided managers with calendars listing weekend events, see Everett Decl., ¶ 14, is not sufficient testimony to demonstrate that any one of her individual managers or supervisors understood that these hours were overtime hours.

In her declaration, Everett also states:

> Due to the significant number of overtime hours I worked, in the earlier years of the 2000s, I hired a lawyer to represent me and several other Grady employees who were not receiving overtime

> compensation in violation of the FLSA.  My lawyer negotiated an agreement with Defendant Grady that would allow us to use the time over forty hours that they [sic] worked as comp time instead of compensating them [sic] for this time.   Defendant Grady, however, backed out of the deal and when I tried to use her [sic] comp time several years later, Grady refused.

See Everett Decl., ¶ 15.  Defendants object to this statement as inadmissible hearsay and in violation of the "best evidence" rule because although Defendants requested information about this event from Everett, she never produced any documents concerning it.

The Court finds no reason that Everett cannot testify as to her recollection of the event.  Given that this is the entirety of the description of the incident before the Court, however, the Court cannot discern much that is relevant to the instant matter.  This testimony alone cannot form the basis of any finding that Defendants "willfully" violated the FLSA as asserted by Everett.  See Doc. No. [81], p. 5-6.  It is difficult for the Court to understand who were the complainants in this incident, let alone that there was ever any finding of a violation of the FLSA by Defendant Grady.  The Court cannot find that the complaints at issue in the situation Everett describes have any association with Everett's current allegations.  Moreover, to the extent Defendants can show they propounded discovery to Everett about this lawsuit in the early 2000s and she produced no

documentation, then the Court would entertain a motion in limine barring the mention of it in these proceedings.

The Court agrees that Everett's statement in Paragraph 16 of her declaration – that "in March 2015, Defendant Grady ordered us to stop all weekend events and on-call services" is in conflict with Paragraph 9 of her declaration which states that the weekend events ended in January 2015. See Everett Decl., ¶¶ 9 and 16. The remaining issues in Paragraph 16 and 17 relate to how Everett characterizes her job function. As the Court stated above, it will consider all of the testimony in the record as to what Everett's job entailed.

In Paragraph 20, Everett explains that at the time Defendants placed her on FMLA leave, she was not performing any of the identified job essentials of her position. Rather, "administrative" tasks took up 95% of her time. Everett only taught two one-hour training classes per month; the remainder of the classes and in-room patient introductions were done by other health educators. Everett does not explain these unidentified "administrative" tasks she performed that did not require any lifting and had her seated behind a computer 95% of the time. See Everett Decl., ¶ 20. There is no reason that Everett cannot testify as to how she viewed her job at the time just as Everett's managers may testify as to their view of what her job did or should require.

Finally, Defendants object to Exhibit 17 submitted with Everett's declaration.   Exhibit 17 is an undated and unsworn document apparently submitted by William Hutchinson, the Child Safety Program Director of the Atlanta Fire Rescue Department and Governor's Office of Highway Safety.  The letter states that Everett and Childress participated in after-hours and weekend community events, including a total of 27 such events in 2014.   Defendant contend Exhibit 17 is not an affidavit or declaration under Federal Rule of Civil Procedure 56(c)(4) and therefore is inadmissible hearsay.  Everett counters only that this letter was produced to Defendants in discovery.

The Court agrees that Exhibit 17 is not an affidavit or declaration and therefore is hearsay at the moment.  Everett has not explained to the Court how such hearsay could be reduced to admissible evidence at trial. For example, Everett has not proffered to the Court that Mr. Hutchinson would be willing and able to testify as to the contents of the letter.  As such, it is not clear to the Court that the letter could be reduced to admissible evidence at trial and it is not clear that the Court can consider it on a motion for summary judgment.  In any event, the letter states only that Everett attended such events, it does not address whether Everett received prior approval to attend and how many hours she attended which particular events.  As such, even if the Court considers this

29

evidence, it is not sufficient for Plaintiffs to rely on Exhibit 17 to establish any hours that Everett or Childress may have worked.

2.    Objections to Childress's Declaration

Childress submitted a declaration in conjunction with her response to Defendants' motion for summary judgment.  Defendants filed objections to portions of Childress's declaration.  See Doc. No. [73].  Childress responded to those objections.  See Doc. No. [77].[6]  The Court addresses the objections on a paragraph-by-paragraph basis bearing in mind that the Court has already discussed similar objections with respect to Everett's declaration.

In Paragraph 2 of Childress's declaration, she testifies that part of her function at Grady is to coordinate Grady's participation in the Injury Free Coalition for Kids of Atlanta.  In Childress's deposition, she stated that her primary job duties are to distribute car seats to mothers who are patients at Grady Hospital.  Childress explains that she was asked in her deposition about "primary" duties and simply failed to list Injury Free Coalition for Kids of Atlanta among the "primary" duties.  Again, this objection centers around whether any work done by Childress for the Injury Free Coalition for Kids of

---

[6]The Court GRANTS Plaintiff Childress's motion for leave to file response [77].

Atlanta on the weekend was "required" by Grady or was voluntary. The Court's legal focus on this issue will be whether Grady, as Childress's employer, had any knowledge that Childress may have been working overtime on these events. As such, any dispute over Grady's relationship with the Injury Free Coalition for Kids of Atlanta will not be material.

In Paragraph 4, Childress testifies as to "routine practice" at Grady regarding on-call time for salaried, exempt employees and Grady's Time Correction Form. Defendants contend that Childress does not have personal knowledge of what might be "routine practice" at Grady. The Court finds no evidentiary basis upon which to discount this evidence. However, while Childress may testify as to her employment experiences and what might be "routine," such testimony cannot dispute the testimony of her managers and supervisors as to what instructions she and Everett were specifically given on how to address hours worked when Childress had not swiped her card.

Childress testifies that Everett was aware of her weekend and on-call work and authorized such work. See Childress Decl., ¶ 5. Childress further states that this time "typically" was not added into the Grady time system because it was the "practice" of Grady not to require salaried, exempt employees to report all of their time. Id. Finally, Childress states that it was her "understanding" that

31

Everett reported these weekend and on-call hours to Everett's managers.  Id. Defendants object to this paragraph claiming Childress does not have personal knowledge as to any "practice" at Grady and that any statement Everett may have made to others is inadmissible hearsay.  Childress responds only that based on her employment at Grady, she has personal knowledge of what is "routine practice."

The Court finds that Childress may testify as to what her experience is as a Grady employee but what she testifies as to "generally" or "typically" cannot dispute specific testimony offered by Grady managers or specific time records. Since Childress did not respond to Defendants' hearsay objection, the Court finds that Everett may testify as to what Everett told her managers, but Childress may not testify as to what she "understood" Everett to have stated to the managers.

In Paragraph 7, Childress testifies that "[i]f I worked an event, that time would not necessarily show up on my time records if I had already worked by forty hours that week because adding the additional time would not provide her [sic] any more compensation." See Childress Decl., ¶ 7.  Defendants object to this testimony as inconsistent with Childress's deposition testimony that if she failed to clock in or made a mistake in clocking out, she would tell her supervisor and her supervisor would enter the correct time.  See Childress Depo., at 204-05.

Plaintiff responds that she "had not seen the time records until they were produced during this litigation. After review of those records, it was clear to Plaintiff Childress that they did not contain all hours worked especially the weekend events if during the week, she already worked enough hours." See Doc. No. [77], Attachment B, p. 4. The Court does not find that Childress's declaration is inconsistent with her deposition testimony, but rather that any reconciliation of the two goes to the weight of the evidence. Childress did testify in her deposition that one way to find out which weekend events she worked was to "look at my time sheets when I, when we was clocking in, before the weekend events stopped." See Childress Depo., at 96. This gives some indication that Childress understood her time records to have included these events.

Similarly, Childress testifies that she and Everett were "repeatedly told by Grady supervisory employees that we were not entitled to overtime compensation and it was not required that we seek to correct our time records to show more than forty hours per week because we would not receive any overtime compensation." See Childress Decl., ¶ 8. Defendants object to this testimony as inconsistent with Childress's deposition testimony that she would inform her supervisors if she had not correctly logged in or out. Again, the Court does not find this testimony "inconsistent" with Childress's prior testimony.

However, as the Court explained above, Childress states only "Grady supervisory employees" and cannot name any person who might have given her this instruction.   For that reason, the Court does not consider Childress's testimony in Paragraph 8.

The problem of unspecified "Grady" continues in Paragraphs 9, 13, and 14 of Childress's declaration where she states: "It was part of my job to work weekend events and be on-call on the weekends and Grady was aware of this requirement."  "I attended these events with full of knowledge of Grady."  "Not only did Grady require myself [sic] and Ms. Everett to attend these events, at some events we included Grady 'signage' as well as brought pamphlets and cards promoting other Grady services."   In addition to the fact that Childress cannot identify who at "Grady" was aware of this requirement, Childress also testified in her deposition that she and Everett went to weekend events because that is what they had done when it was a grant program and they simply continued doing that when Grady took over the program.  See Childress Depo., at 95.  She testified that "[n]o one told me I could" attend the programs.  Id. For all of these reasons, the Court will not consider Paragraphs 9, 13, and 14 of Childress's declaration.

In Paragraph 15, Childress testifies that she also participated in telephone calls and meetings away from Grady and did so with the "full knowledge and authorization of my supervisor." Defendants "object" by stating that the unnamed supervisor in this paragraph could only have been Everett because all of Childress's other supervisors testified that the had no knowledge of Childress's participation in such calls. The Court accepts Paragraph 15 to the extent that it was Everett who was Childress's supervisor.

Finally, Childress testifies that although her hours varied, she understood the grant to cover 32 hours per week. <u>See</u> Childress Decl., ¶ 18. "At no time did I believe that my salary was intended to compensate me for any and all hours worked. I understood it to mean that I was required to work thirty-two hours in order to receive my salary." <u>Id.</u> Defendants object stating that in her deposition, Childress testified that she was aware she would receive the same salary no matter how many hours she worked.

Childress testified in her deposition that the 32 hours per week was during the time of the grant from the Governor's Office. <u>See</u> Childress Depo., at 100. She was then asked "[o]nce the Governor's program ended, though, you didn't have a 32 hour a week job, did you?" And she responded: "Not that I know." <u>Id.</u> The following colloquy then took place:

Q:     But you understood that your job was to work 40 hours per week, was that your –

MR. MARTIN:      Object to the form.

Q:     Was your understanding that you needed to work 40 hours per week?

A.     Yes.

Q:     Were you aware that you were being paid a salary?

A:     Yes.

Q:     And were you aware that you received that salary whether you worked 28 hours or 50 hours a week?

MR. MARTIN:      Object to the form.

THE WITNESS:     Yes.

Q:     Where you aware that you received the same salary no matter how many hours you worked during the week.

A:     Yes.

Id. at 100-02.  Up until November 2014, Childress got paid the same amount regardless of how many hours she worked.  Id. at 102.

The Court finds that Childress's later declaration in Paragraph 18 directly conflicts with her prior deposition testimony concerning whether her salary was intended to compensate her for any and all hours worked.  As such, the Court

36

will not consider Paragraph 18 of Childress's declaration.  See Van T. Junkins v. U.S. Industries, Inc., 736 F.2d 656, 657 (11th Cir. 1984).

>    3.    Objections to Everett's Declaration on Behalf of Childress

Everett submitted a declaration in conjunction with Childress's response to Defendants' motion for summary judgment.  See Doc. No. [64], Ex. 2. Defendants filed objections to portions of Everett's declaration.  See Doc. No. [71].  Childress responded to those objections.  See Doc. No. [77].  The Court addresses the objections on a paragraph-by-paragraph basis.

Everett testifies that "[w]e also attend weekend events held through Georgia to instruct parents on the proper usage of car seats and to give car seats to parents unable to afford them." See Everett (Childress) Decl., ¶ 2. Defendants object to Paragraph 2 as being inconsistent with Plaintiffs' job descriptions and Childress's testimony.  The Court finds no inconsistency in this testimony, but also finds that it does not dispute the testimony of Plaintiffs' supervisors that prior approval was necessary before attending weekend events.

The Court finds that Paragraph 3 of Everett's declaration does not contain any additional material information and therefore the Court need not address Defendants' objections to that paragraph.

Paragraph 6 of Everett's declaration is a repetition of prior testimony that it was "general practice" at Grady that salaried, exempt employees take calls away from work and that the "Time Correction Form" is not "typically" used and that unnamed supervisors "repeatedly" told Everett and Childress that because they were exempt employees, it did not matter what their time records said.  For the same reasons as given above, the Court will not consider testimony concerning the directions of unnamed Grady supervisors.  Everett may testify as to general and/or typical practice, but such testimony will not dispute specific testimony of Plaintiffs' supervisors on this matter.

Everett testifies in Paragraph 7 as to a mix of instructions that she specifically gave Childress, "general practices" of Grady, and her views of what Childress's time records might show.  Of these items, Everett has personal knowledge of what she instructed or authorized Childress to do.  The Court considers only those statements which include: "I was aware and authorized Plaintiff Childress to work events on the weekends as a Grady employee and to take on-call on weekends which required her to return to the hospital to talk with new parents on the weekends. . . . Not only did I authorized this work, but I made my managers aware of this work during weekly meetings." See Everett (Childress) Decl., ¶ 7.

Everett also testified that "[s]ometimes events worked by Plaintiff Childress were listed on fliers that were provided to Grady showing she worked on the weekend." <u>See</u> Everett (Childress) Decl., ¶ 8. Defendants object that the content of the flyers is hearsay and that the flyers do not definitively show which events Childress worked. To the extent Plaintiffs have specific flyers that they can introduce into evidence, the Court may consider such "hearsay" on a motion for summary judgment because it can presumably be reduced to admissible evidence at trial. As it stands, however, Everett's statement is simply that such flyers sometimes existed and sometimes were provided to Grady. The Court accepts the statement to that extent alone.

Paragraph 10 is a repetition of testimony about what unnamed supervisors at Grady told Plaintiffs about whether it was necessary to correct time records. Because Everett does not name any supervisor who told her this, the Court does not consider this testimony to dispute the testimony of Plaintiffs' supervisors in this litigation that they instructed employees to enter correct time records.

The Court accepts Everett's testimony that "[i]t was part of Plaintiff Childress's job to work weekend events and on-call on the weekends and Grady was aware of this requirement." <u>See</u> Everett (Childress) Decl., ¶ 11. This is repetitive testimony and again does not dispute the specific testimony of

Plaintiffs' supervisors that they were required to get prior approval before attending these weekend events.

Everett testifies that "[k]eeping with Grady's practice, other managers did not enter into the time system all actual time worked by Ms. Childress." See Everett Decl., ¶ 15. The Court is not certain that it even understands what Everett means in this paragraph, but in any event, Everett has not laid any foundation that she would have personal knowledge of what other unnamed managers did or did not do. The Court does not consider this paragraph.

Everett also testified that "Ms. Childress attended the weekend events as an employee of Grady. These events were not voluntary. Nobody at Grady ever told me that these events were voluntary." See Everett (Childress) Decl., ¶ 16. Defendant objects arguing that Childress's job description does not list a requirement to attend events and in her deposition, Childress testified that no one ever instructed her to attend the events. The Court finds no basis in Defendants' objection to strike this portion of Everett's testimony.

Everett testifies in Paragraph 17 as to a mix of information, some concerning her personal activity, some related to what "Grady" did or did not know, and finally a contention about events were or were not included in Childress's time records. Of these items, Everett has personal knowledge of what

she did.  The Court considers only those statements which include: "However, during weekly meetings, I would discuss the weekend events and other manager, [sic] like Sanchez, who were in attendance would learn that Ms. Childress and/or I had performed a weekend event." <u>See</u> Everett (Childress) Decl., ¶ 17.  There is no foundation that Everett would have any knowledge of what was in or not in Childress's time records.  And beyond what she, herself, knew, there is no foundation that Everett would have any understanding of what "Grady" would know.

Everett stated that "[n]ot only did Grady require Ms. Childress and myself to attend these events, at some events we included Grady 'signage' as well as brought pamphlets and cards promoting other Grady services." <u>See</u> Everett (Childress) Decl., ¶ 18.  As the Court explained above, Everett has not identified an particular manager at Grady who required Everett or Childress to attend any event.  For that reason, the Court finds no relevant evidence in this paragraph.

Defendants object to Paragraph 19 of Everett's declaration because it "presumably" refers to telephone calls for the National Coalition.  Everett does not specify which calls she claims Childress was "required to participate in" and the Court accepts this testimony for its very limited usefulness.

41

Everett testified that "[t[here were calendars and fliers that showed some of the events the Ms. Childress worked and I provided these documents to other supervisors so they were aware that she was working these events." <u>See</u> Everett (Childress) Decl., ¶ 21. This statement is so vague as to be relatively unhelpful. The fliers for "some" events were shown to unnamed supervisors, as well as calendars that did not specify which employee would be working these events. There is no particular reason to strike this testimony, but the Court can only take it for what it is worth. Similarly, Everett's testimony that "Grady's [timekeeping] system does not contain all hours worked by Ms. Childress," <u>see</u> Everett (Childress) Decl., ¶ 24, is too vague to be particularly helpful. <u>See also</u> Everett (Childress) Decl., ¶ 25 ("Grady's Time Summary Report for Ms. Childress contains some of the hours she worked but it does not contain record [sic] of all the hours she worked.").

Because Everett cannot identify who at "Grady" was aware of her work, the Court does not consider Everett's testimony that "[a]ll time worked by Ms. Childress was directed and authorized by me and Grady was aware of her work." <u>See</u> Everett Decl., ¶ 22.

The Court does not accept Everett's legal conclusion that "Grady never compensated Ms. Childress for hours over forty in a workweek." <u>See</u> Everett

Decl., ¶ 26.  Furthermore, the Court notes that Everett's testimony that the original grant was for thirty-two hours a week of work is not relevant to the time period of Plaintiffs' complaint which is after the Governor's Office grant terminated.  Id.

The Court addressed above Everett's description of the legal issues she had with Grady and compensatory time in the early 2000s.  See Everett (Childress) Decl., ¶ 27.  The Court agrees that there is no foundation for an assertion that Everett would have personal knowledge to testify that "Grady never made an inquiry into Ms. Childress's position to determine whether it was compensating her correctly under the FLSA."  See Everett (Childress) Decl., ¶ 28.  The Court does not consider this testimony.

4.    Scope of Defendants' Motion for Summary Judgment

Everett contends that Defendants did not move for summary judgment on two of her three claims under the Pregnancy Discrimination Act.[7]  Everett contends that Defendants discriminated on the basis of her pregnancy by (1) forcing her on unpaid medial leave when she informed Grady that she was pregnant, (2) refusing to permit her to temporarily work from home when she

---

[7]The Court GRANTS Plaintiff Everett's first motion for leave to file surreply [80].

43

notified them of her medical condition related to pregnancy, and (3) retaliating against for her previous complaints in this case by refusing to permit her to work temporarily from home.  Everett contends that Defendants only moved for summary judgment on her second claim.  Everett offers that because Defendants failed to file a motion for summary judgment as to claims one and three, she will go to trial on those claims and will not oppose Defendants' motion for summary judgment as to claim two.

Defendants respond that by asking the Court now to adjudicate all three claims, they are not raising any new arguments, but rather are asking the Court to apply the arguments already made against Everett's retaliation and disability discrimination claims to the three aspects of Everett's pregnancy discrimination claim she now identifies.

Everett is incorrect in her assumption that simply because Defendants may not have moved for summary judgment on a particular claim, that claim will automatically go to the jury.  Before a claim can go to a jury, the Court must determine that based on the evidence in the record, a reasonable jury could find in favor of the plaintiff on that claim.

Here, the Court notes that confusion has arisen concerning Everett's pregnancy discrimination claim because she pled what she now contends are

44

three separate claims under one count of her third amended complaint. Moreover, the Court does not find that what Everett describes as her first and second claims are particularly distinguishable.  After she became pregnant, Everett asked for intermittent leave under the FMLA due to her high-risk pregnancy.  That leave was granted.  At the end of April and beginning of May, Everett presented two doctor's notes, one requesting "light duty" and the second stating that Everett could not lift anything and would stand/walk only 15 minutes per hour. Shaw, Everett's supervisor, determined that Everett could not perform the essential duties of her job if she could not lift and if she could not stand/walk more than 15 minutes per hour.  Everett now contends this is the basis for a separate claim of discrimination under the Pregnancy Discrimination Act.  But only two weeks after placing her on leave, on May 22, Grady offered to restore Everett to her position with these medical restrictions and to return any used FMLA leave, as well as compensation for the days missed.  Significantly, however, Everett turned that offer down.  Everett's rejection of this offer from Grady is an admission that she could not perform her job even with these medical restrictions.  As such, Grady's brief refusal to permit her to work under these restrictions cannot form a separate basis for a claim of pregnancy discrimination.

45

The Court discusses below what Everett labels as her second claim of discrimination – Grady's refusal to allow Everett to work full time from home. Finally, Everett contends that she has a separate retaliation claim under the Pregnancy Discrimination Act alleging that Grady refused to allow her to work from home in retaliation for her "previous Complaints in the case." See Doc. No. [80], p. 2; Third Am. Cmplt., ¶ 78.  However, a plaintiff alleging a claim of retaliation under the Pregnancy Discrimination Act must allege that the defendant retaliated against her for complaining about pregnancy discrimination and not just complaints in general.  See, e.g., Miller v. American Family Mut. Ins. Co., 203 F.3d 997, 1007-08 (7th Cir. 2000) ("An employee, of course, need not use the words 'pregnancy discrimination' to bring her speech within Title VII's retaliation protections . . . [b]ut she has to at least say something to indicate her pregnancy is an issue."); Godby v. Electrolux Corp., Civil Action No. 93-CV-353, 1994 WL 777327 (N.D. Ga. May 25, 1994) (citing 42 U.S.C. § 2000e-3(a) (statute makes it unlawful for employer to discriminate against employee that "has opposed any practice made an unlawful employment practice by [Title VII]."), aff'd, 58 F.3d 641 (11th Cir. 1995).  Everett did not complain about pregnancy discrimination until she filed her second amended complaint at the end of June 2015. Furthermore, the Court discusses at length below why Everett's request to

work full time from home was not a reasonable accommodation under the ADA or the basis for retaliation under the FLSA.  Given the Court's outcome under both of those statutes, there could be not different outcome under Title VII's retaliation provisions.

For all of these reasons, the Court finds that no reasonable jury could conclude that Defendants are liable to Everett for pregnancy discrimination when they placed Everett on FMLA leave after she presented a doctor's note stating she could not lift and could not stand/walk more than 15 minutes per hour or when Defendants determined that Everett could not fulfill the essential functions of her job by working at home full time.  The Court fully adjudicates Everett's pregnancy discrimination claim below.

## B.     FLSA Administrative Exemption (Everett)

The Fair Labor Standards Act requires that employees who work in excess of forty hours per week be compensated "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).  The FLSA, however, directs that overtime pay is not required for certain classes of employees, including those "employed in a bona fide executive, administrative, or professional capacity." Id., § 213(a)(1). Defendants contend that Everett is covered by the "administrative" exemption to the FLSA.  Employers relying on

47

an exemption to avoid the minimum wage and overtime requirements of the FLSA bear the burden of proving the applicability of that exemption. Klinedinst v. Swift Inv., Inc., 260 F.3d 1251, 1254 (11th Cir. 2001). Exemptions are narrowly construed against the employer. Id.

An employee qualifies for the administrative exemption if (1) she is compensated at a rate of not less than $455 per week, (2) her "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and (3) her "primary duty involves the exercise of discretion and independent judgment with respect to matters of significance." See 29 C.F.R. § 541.200(a); see also Hogan v. Allstate Ins. Co., 361 F.3d 621, 625 (11th Cir. 2004). In Hogan, for example, the court held that employees whose duties included "promoting sales, advising customers, adapting policies to customer's needs, deciding on advertising budget and techniques, hiring and training staff, determining staff's pay, and delegating routine matters and sales to said staff," engage in administrative – and not production – tasks. Id. at 627. The court also held that such tasks would require the employees to exercise discretion and independent judgment. Id.

There is no dispute here that Everett meets the first prong as she earns $71,000, well in excess of $455 per week. "For an employee to meet the primary duty prong, his 'primary duty must be the performance of exempt work.'" Kessler v. Lifesafer Serv. Providers, LLC, 545 F. Supp. 2d 1244, 1247 (M.D. Fla. 2008) (quoting 29 C.F.R. § 541.700(a)). "The term 'primary duty' means the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). "An employee's primary duty is determined on a case-by-case basis by considering 'the character of the employee's job as a whole.'" Kessler, 545 F. Supp. 2d at 1247 (quoting 29 C.F.R. § 541.700(a)). The following factors should be considered are when determining the an employee's primary duty:

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a).

Here, since 2005, Everett has been the Program Manager for Grady's Injury Free/Car Seat Program. Everett's job description states that she "directs and provides administrative leadership" for the Program. Everett's own testimony

49

establishes that her primary duty is exempt work in supervising the car seat program and supervising and scheduling health educators. Everett, herself, testified that she performed 95% administrative functions in running the car seat department and that the health educators primarily performed the duties of teaching classes, making patient rounds, and distributing car seats.

The second prong surrounds whether the employee's primary duties involve "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. § 541.200(a)(2). "To meet this requirement, the employee 'must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.'" Rock v. Ray Anthony Int'l LLC, 380 F. App'x 875, 877 (11th Cir. 2010) (quoting 29 C.F.R. § 541.201(a)).

Here, the Court finds Everett's primary duties were managing and organizing the car seat program as opposed to performing tasks such as teaching courses, making rounds, or distributing car seats. While Everett did perform certain of these general tasks, she, herself, testified that most of her time was taken with scheduling the health educators who performed these tasks,

determining which events to schedule on the program's calendar, working on obtaining grant money to fund the program, and maintaining the program's statistics.   Everett evaluated Childress's job performance.   She attended a quarterly management training program called the Leadership Development Institute which is open only to Grady managers and supervisors.   For these reasons, the Court disagrees with Everett's argument that her primary job duties related only to the "customer service" of providing qualified patients with free car seats.

As to the third prong, courts "must determine whether the employee's job 'involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered.'" Rock, 380 F. App'x at 878 (quoting 29 C.F.R. § 541.202(a)).   The fundamental question is whether the employee is allowed "to make an independent choice, free from immediate direction or supervision." 29 C.F.R. § 541.202(c).   The employee's primary duties must involve "more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." Id. § 541.202(e). "[E]mployees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." 29 C.F.R. § 541.202(c). "The term 'matters of

significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a).

Here, it is undisputed in the record that Everett ran the car seat department with very little supervision.  Everett's managers were housed in a different part of the hospital and she met with them more often monthly, and at most weekly. Everett had the discretion to schedule the health educators at the hospital and to schedule what events the health educators would attend.  Everett worked with Grady Vice Presidents to present a justification for Grady to continue the program, to develop a workflow plan, and with Grady's legal department and physicians to create and implement a car seat policy.

For all of these reasons, the Court finds that Defendants have demonstrated as a matter of law that Everett is an exempt administrative employee and not entitled to overtime pay.  The Court GRANTS Defendants' motion for summary judgment on Everett's FLSA overtime claim.

## C.    FLSA Statute of Limitations

"The statute of limitations for claims seeking unpaid overtime wages generally is two years, but if the claim is one 'arising out of a willful violation,' another year is added to it." Alvarez Perez v. Sanford-Orlando Kennel Club, Inc., 515 F.3d 1150, 1162-63 (11th Cir. 2008).  Courts in this circuit have assumed that

the question of willfulness is one for the jury.  Id. at 1163 n.3 ("In the district court, the court and the parties assumed that the jury was to decide willfulness, and the parties have assumed that in their briefs and arguments to us. So, we assume it too.").

To establish that a violation of the Act was willful, a plaintiff must prove by a preponderance of the evidence that his employer either knew its conduct was prohibited by the statute or showed reckless disregard about whether it was. Id. at 1164; see also McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988). "Reckless disregard" is defined by the Code of Federal Regulations as the "failure to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104.

The Eleventh Circuit has described "willfulness" as follows:

An employer willfully violates the Act if he should inquire as to whether his actions violate the Act, but fails to do so. The Supreme Court held in McLaughlin v. Richland Shoe Co., 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988), that a willful violation of the Act occurs when an employer either knows that his conduct is prohibited by or "show[s] reckless disregard for" the minimum wage laws, id. at 133, 108 S.Ct. at 1681. See 29 C.F.R. § 578.3(c)(1). An employer knowingly violates the Act if he disregards the minimum wage laws deliberately or intentionally, McLaughlin, 486 U.S. at 133, 108 S.Ct. at 1681, such as by ignoring "advice from a responsible official ... that the conduct in question is not lawful," 29 C.F.R. § 578.3(c)(2). An employer acts with reckless disregard for the Act if the employer's conduct is more than "merely negligent,"

53

> McLaughlin, 486 U.S. at 133, 108 S.Ct. at 1681, and is blameworthy "if the employer should have inquired further into whether [his] conduct was in compliance with the Act, and failed to make adequate further inquiry," 29 C.F.R. § 578.3(c)(3); see 5 C.F.R. § 551.104. In other words, an employer does not commit a willful violation if he "acts unreasonably, but not recklessly, in determining [his] legal obligation" under the Act. McLaughlin, 486 U.S. at 135 n. 13, 108 S.Ct. at 1682 n. 13.

Davila v. Menendez, 717 F.3d 1179, 1184-85 (11th Cir. 2013); see also Parada v. Banco Industrial De Venezuela, C.A., 753 F.3d 62, 71 (2d Cir. 2014) ("If an employer acts unreasonably, but not recklessly, in determining its legal obligation, its action should not be considered willful.") (quotation and citation omitted); Ojeda-Sanchez v. Bland Farms, LLC, 499 F. App'x 897 (11th Cir. 2012) ("Neither negligence, nor even unreasonable conduct, is sufficient to prove willfulness.").

In Davila, for example, the Eleventh Circuit found a reasonable jury could conclude that the defendants' violation of the Fair Labor Standards Act was "willful" where the defendants testified they knew of the hourly wage laws and did not investigate whether they were in compliance, they did not record the employee's work hours, and they paid the employee in cash. Id. at 1185. In Morgan, the Court of Appeals held the jury was authorized to find "willfulness" where the defendant's executives testified that they never studied whether the

store managers were exempt employees, they could not point to who had made that a company policy, and supervisors were in a position to see that the employees' time was spent "performing manual, not managerial, tasks."  See Morgan, 551 F.3d at 1280-81.  In Ojeda-Sanchez, however, the Court of Appeals found that evidence of six prior wage and hour lawsuits in past 16 years, active accounting procedures, and correction of errors when located was sufficient to preclude "willful" determination.  See 499 F. App'x at 903; see also Kaplan v. Code Blue Billing, 504 F. App'x 831 (11th Cir. 2013) (affirming summary judgment on two year statute of limitations).

Even though willfulness can be a question for the jury, as with any other issue before the Court on summary judgment, Plaintiff must still proffer sufficient evidence from which a reasonable jury could determine that Defendant acted willfully.  Here, there is no evidence in the record that Grady had actual knowledge it was violating the FLSA by not paying Childress overtime compensation, assuming she was entitled to such compensation.  The only argument Childress makes that Grady acted "willfully" in failing to properly pay her under the FLSA is a reference to a prior claim by Everett in the early 2000s. As the Court described above, however, there is no information in the record as to what type of claim was made, which employees made the claim and where

they worked, and what Grady did in response to the claim.  There is no evidence in the record that any "agreement" was reached to settle the matter or that Grady "broke" any such agreement.  The Court has no basis upon which it can compare the allegations from the early 2000s to the allegations made by Childress today.  In fact, the only general description of the prior incident is that it involved compensatory time, an issue not present in the instant case.

When Childress was hired, she was originally paid out of a grant.  Thus, nothing can be inferred from the fact that Grady determined her status to be "exempt" at the time her employment began.  When that grant ended, Grady incorporated her employment into its own child safety program and continued to pay Childress a salary.  There is no dispute that Grady made efforts to keep accurate time records.  Childress testified that she knew she was to swipe her badge when she entered and left the hospital so as to allow for accurate reporting of her time.  She also testified that she knew she was to report all off-the-clock time to her managers so that there would be an accurate time record.  Neither Childress nor Everett has been able to identify any specific manager at Grady who told them that it was not necessary to keep accurate records of time once they logged forty hours in one week.  The entire premise of Childress's claim is that she was misclassified as exempt and should not have been paid a salary and

should have been paid on an hourly basis.  But Childress does not present any evidence from which a jury could conclude that Grady willfully ignored anything about Childress's employment circumstances which would have pointed to the fact she was misclassified.  Childress did not raise the issue of overtime compensation with anyone at Grady prior to filing suit.

For all of these reasons, the Court concludes there is not sufficient evidence in the record from which a reasonable jury could conclude that Defendant Grady was "willful" in its failure to properly compensation Childress.  As such, the Court applies a two year statute of limitations to Childress's claims.

### D.   FLSA Liability

Defendants contend that Childress is not entitled to overtime because she cannot demonstrate that she worked overtime without compensation and that Grady knew or should have know of her overtime work.  The Fair Labor Standards Act provides that an employer may not employ his employee for more than 40 hours per week unless the employee receives overtime compensation at a rate of at least one and a half times his regular rate.  29 U.S.C. § 207(a)(1).  "[I]f the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted."  Reich v. Dep't of Conservation & Nat. Res., 29 F.3d 1076, 1082 (11th Cir. 1994) (citing 29 C.F.R. § 785.11).

A plaintiff must demonstrate that (1) he worked overtime without compensation and (2) the employer knew or should have known of the overtime work. See, e.g., Allen v. Board of Public Education for Bibb County, 495 F.3d 1306 (11th Cir. 2007); see also 29 C.F.R. § 785.11 (interpreting "suffer or permit to work" requirement to mean that employer violates FLSA when it "knows or has reason to believe that he is continuing to work and the time is working time"); Bailey v. TitleMax of Georgia, Inc., 776 F.3d 797, 801 (11th Cir. 2015) ("If an employer knew or had reason to know that its employee underreported his hours, it cannot escape FLSA liability by asserting equitable defenses based on that underreporting.").

In Allen, on summary judgment, the district court considered whether the employer had actual or constructive knowledge that the employee was working overtime. There, the plaintiffs were bus drivers, paraprofessionals, secretaries, and custodians, who alleged that the school district's method for computing time violated the Fair Labor Standards Act. One of the plaintiffs testified that her supervisor told her that she could not continue to work overtime and she would need to take compensatory leave. See 495 F.3d at 1318. Another employee said that she attended meetings where her supervisor told her she could not approve overtime, but the supervisor did not say that employees should not work

58

overtime. Id. at 1319. The plaintiff stated she worked three or four Saturdays to prepare paperwork for teachers and on several of those occasions, her supervisor was also at the school at the same time. The plaintiff also testified that she told her supervisor that she brought work home to complete. The court found this testimony created a genuine issue of material fact as to whether the employer had actual knowledge the plaintiff was working overtime. Id.

The Allen court next considered the issue of constructive knowledge. Id. at 1319. "An employer is said to have constructive knowledge of its employee's overtime work when it has reason to believe that its employee is working beyond his shift." Id. (citing 29 C.F.R. § 785.11). "The employer's knowledge is measured in accordance with his duty . . to inquire into the conditions prevailing in his business." Id. (quotation and citation omitted). The defendants pointed to the fact that some of the plaintiffs "had not informed their supervisors of their overtime work, or had not told them that they had not recorded or been paid for hours that the supervisor may have known they worked beyond their scheduled hours." Id. at 1319-20. The court found, however, that the plaintiffs were able to create genuine disputes of fact as to whether the supervisors should have known the employees were working beyond their scheduled hours. Id. at 1320. This testimony included one plaintiff stating that her supervisor clocked out her time

card when he knew she was still working; another testifying that his supervisor altered his time sheet; another stating he told his supervisor that he was working late; another testifying that her employers knew she was working through lunch because they saw her taking care of children in the lunch room; and another who was told by his supervisor that he should record his scheduled end time on his time sheet regardless of whether he was still working. Id. at 1320-21.

The defendants argued, however, that "even if the supervisors were aware that Plaintiffs were working beyond their scheduled hours, the supervisors did not know that Plaintiffs were not recording their time and would not be paid." Id. at 1321. The court held it "believed that these arguments should be made to a jury" because "circumstances were such that, even if these Plaintiffs did not inform their supervisors that they were not recording their hours, a jury could still charge [the employer] with constructive knowledge." Id. The court denied the defendant's summary judgment motion as to the plaintiffs who had proffered such testimony. The court dismissed the claims of other plaintiffs who had not presented sufficient evidence that the employer should have known of her overtime work. Id. at 1322-23. One such plaintiff testified only that she stayed late, but no one told her to work off the clock and she did not inform anyone of this overtime work. She also testified that she did not know how her supervisors

could have known she was working overtime.  Id. at 1323.  The court determined this was a "mere scintilla" of evidence not sufficient to create a genuine issue of fact.  Id.

Other courts have considered the issue of whether employees were required to work through meals.  See, e.g., White v. Baptist Memorial Health Care Corp., 699 F.3d 869, 876 (6th Cir. 2012) (court granted summary judgment for employers where employee told supervisors she was not getting her meal break, but did not tell her supervisors she was not being compensated for not getting her meal break, as there is "no way" employer "should have known" she was not being compensated for missed meals particularly where there was "no evidence that [employers] discouraged employees from reporting time worked during meal breaks or that they were otherwise notified that their employees were failing to report time worked during meal breaks"); Hertz v. Woodbury County, 566 F.3d 775, 783-84 (8th Cir. 2009) (holding police officers in best position to inform employer they were working during meal time and requiring County to "prove a negative" that employees were not performing work would "perversely incentivize employers to keep closer tabs on employees"); Newton v. City of Henderson, 47 F.3d 746, 749 (5th Cir. 1995) (where DEA officer detailed to city was told city could only pay 12.5 hours of overtime per pay period but he

submitted paperwork to DEA showing greater number of overtime hours, court found city did not have constructive knowledge because simply knowing of task force's activities was not enough to trigger constructive knowledge; court also emphasized that city had "specific procedures" for employees to follow to be paid overtime and officer had ignored those procedures; to find constructive knowledge under those circumstances would "essentially be stating that the City did not have the right to require an employee to adhere to its procedures for claiming overtime").

On the issue of constructive knowledge, the court finds that the Allen court rejected one of the same arguments Defendants make here: "even if the supervisors were aware that Plaintiffs were working beyond their scheduled hours, the supervisors did not know that Plaintiffs were not recording their time and would not be paid." See Allen, 495 F.3d at 1321.  The Allen court held it "believed that these arguments should be made to a jury" because "circumstances were such that, even if these Plaintiffs did not inform their supervisors that they were not recording their hours, a jury could still charge [the employer] with constructive knowledge." Id.  The Allen court continued:

> Our cases indicate that an employer can be charged with constructive knowledge even when an employee has not alleged a supervisor's direct knowledge.  We have said that if an employer

had an opportunity to acquire knowledge of an employee's work by using reasonable diligence, then the employer can be charged with constructive knowledge. . . . An employer is not excused merely because his business requires him to rely on subordinates and personal supervision is not possible. . . . The cases must be rare where prohibited work can be done . . . and knowledge or the consequences of knowledge can be avoided.

Id.

1.    Meal Breaks

The Court finds that there is a dispute of fact as to whether Childress is entitled to compensation for meal breaks. Childress contends that she has been misclassified as an exempt employee. Because Grady treated her as an exempt employee, Childress theorizes, Grady did not view her as being under the meal break policy. Thus, while the policy did provide that nonexempt employees who worked through lunch would be compensated so long as they notified their supervisor they did work through lunch, this policy did not apply to Childress because Grady treated her as an exempt employee. In fact, Childress testified that it was not until documents were produced in this case that she learned Grady had a meal break policy and that a thirty minute meal had been automatically deducted from her pay for every 4.5 hour day worked.

Childress also testified that Everett was aware that she worked through lunch breaks because they were often together in the office eating lunch. Because

Everett is Childress's most immediate supervisor, Everett's testimony creates a dispute of fact as to whether Childress's supervisors were aware of her working through lunch despite the fact that Childress's other managers – Sanchez, Caulfield, McIntosh, and Shaw – testified they were not aware that Childress performed any work during lunch breaks.

The Court addresses below whether Childress's testimony is sufficient to establish how often and for how long she did work through lunch breaks and the additional issue that even if Childress were entitled to meal breaks, the extra meals break hours still would not bring her total hours per week to over forty.

2.   <u>On-Call</u>

The parties agree that Childress would only be entitled to on-call hours where she actually was called in and returned to the hospital.  <u>See</u> Doc. No. [64], p. 8; <u>see</u> <u>also</u> <u>Armour & Co. v. Wantock</u>, 323 U.S. 126, 133 (1944); <u>Birdwell v. City of Gadsden</u>, 970 F.2d 802 (11th Cir. 1992).  Childress does not seek compensation for hours where she was merely scheduled to be on call.  Grady argues that its timekeeping system would capture all on-call hours where Childress actually worked because she had to swipe her identification card when she entered the hospital.  The Court addresses below whether Childress can show any on call hours actually worked for which she has not already been compensated.

3.   Off-The-Clock/Weekend Hours

The majority of the parties' dispute concerning hours of overtime surrounds "off the clock" or weekend hours that Childress claims for her attendance at various events promoting child safety.  Childress and Everett testified that when they worked under the grant from the Governor's Office, it was part of their duties to attend such events and distribute car seats.  After the grant ended and Grady continued a car seat program on its own, it appears that Childress and Everett continued to attend these events despite the fact that the managers supervising the program believed that Childress and Everett should obtain prior approval for events and then should report time spent at the events so as to maintain accurate time records.  Everett testifies that she met periodically with those supervisors (who worked in a separate office and would not have any visual observation of Childress's work hours) and she provided calendars and the occasional flyer advertising these functions.

Although Grady denies that such weekend events were part of Childress's job requirements, Everett, as Childress's Grady supervisor, testified that she believed the events to be part of Childress's job and was aware that Childress was working these events.  As such, the Court finds there is a dispute of fact as to whether Childress and Everett could have reasonably believed that these

weekend events were part of their duties to Grady's car seat program after the grant program ended.   The Court discusses below whether Childress can demonstrate the amount of hours she worked at these events.

Similarly, the Court also finds that there is a dispute of fact as to whether additional off-site work each day and telephone conferences Childress participated in for the National Injury Free Coalition were part of her job duties. It is undisputed that Sanchez, Caulfield, McIntosh, and Shaw were not aware of these activities, but Everett, as Childress's immediate supervisor did know that Childress participated in these activities and testified that she believed those activities to be part of Childress's job requirements.

4.   Evidence of Hours Worked

Under the FLSA, the employer is required to keep records of wages and hours worked. 29 U.S.C. § 211(c). The records must include the "[h]ours worked each workday and total hours worked each workweek."  29 C.F.R. § 516.2(a)(7). In situations where an employer has failed to keep adequate records of the numbers of hours worked, the Court must utilize the burden-shifting framework set forth in Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1946).  Under this framework, an employee must initially show the statute is violated and then show the extent of his work as a matter of "just and reasonable inference."  Id.

66

at 687.  In <u>Lamonica v. Safe Hurricane Shutters, Inc.</u>, 711 F.3d 1299 (11th Cir. 2013), the Eleventh Circuit addressed the manner in which courts are to apply <u>Mt. Clemens Pottery</u>.  The court stated:

> The FLSA places upon the employee-plaintiff "the burden of proving that he performed work for which he was not properly compensated." <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 686–87, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). However, if the employer failed to keep time records, as in this case, that burden is relaxed. Specifically, in that circumstance an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate. <u>Id.</u> at 687–88, 66 S.Ct. 1187.

<u>Id.</u> at 1315.

As the Court outlined above, <u>Mt. Clemens Pottery</u> does recognize a relaxed burden on a plaintiff where the employer fails to keep adequate records. However, a plaintiff still must show that the employer failed to keep adequate records and "prove[] that he has in fact performed work for which he was improperly compensated and . . . produce[] sufficient evidence to show the

AO 72A
(Rev.8/82)

amount and extent of that work as a matter of just and reasonable inference." See Mt. Clemens Pottery, 328 U.S. at 687.

Typically, in the Eleventh Circuit, courts apply Mt. Clemens Pottery "in situations where no records were kept at all or no overtime was recorded." See Etienne v. Inter-County Sec. Corp., 173 F.3d 1372, 1376 (11th Cir. 1999). Etienne, for example, declined to apply the burden-shifting framework where only one week of records was misplaced found that the burden-shifting analysis should not apply "every time employers had any error at all in their records." Id.

Here, it is clear that Grady has a timekeeping system, requires employees to swipe their cards to activate the timekeeping system, and instructs its employees that they must notify their supervisor if they work time outside of the hospital so that the time records can be updated to reflect that time. Furthermore, there is no evidence that any specific supervisor instructed Childress not to report time. On the other hand, Childress presents her testimony and that of Everett to state that despite being instructed to the contrary, they did not report off-the-clock hours to their time supervisor because they believed it to be a "practice" of Grady that exempt employees were not compensated for such hours. Everett and Childress have testified that Childress

68

participated in job-related activities outside of the hospital and did not report her time because Everett did not believe it necessary to do so.

This testimony creates a dispute of fact as to whether Grady's time records captured all of the time worked by Childress. But this is clearly not a situation where Grady's time recording system failed, was inadequate, or was inaccurate. Rather, it is the manner in which Everett, as Childress's supervisor, instructed her to undertake certain activities without requiring that she report that time that has created the ambiguity as to Childress's time records.

Nonetheless, the Court finds Childress has made sufficient showing that accurate records were not kept because there is evidence in the record to show that her overtime hours may not have been consistently or accurately tracked. But there is no evidence in the record that the reason for this failure was a misguided attempt by Grady to avoid the requirements of the FLSA. Thus, the Court finds this situation very different from that described in Allen v. Bd. of Pub. Educ. for Bibb County, 495 F.3d 1306 (11th Cir. 2007), where there was evidence that employer altered time sheets, forced employees to edit time sheets, and destroyed time sheets which evidenced overtime.

Because viewing the evidence in the light most favorable to Childress she can show that accurate records may not have been kept, the Court proceeds with

a Mt. Clemens Pottery analysis.  However, under Mt. Clemens Pottery, before any burden is shifted to the employer, the employee (1) must proffer sufficient evidence that he has actually performed overtime work and (2) show the amount and extent of that work as a matter of "just and reasonable inference."  The Court recognizes that it is permissible for a plaintiff to rely on overtime hours that are "reconstructed from memory, inferred from the particulars of the jobs . . ., or estimated in other ways."  See, e.g., Espensheid v. DirectSat USA, LLC, 705 F.3d 770, 775 (7th Cir. 2013) (Posner, J.); Olivas v. A Little Havana Check Cash, Inc., 324 F. App'x 839 (11th Cir. 2009) (employer chose to rely on employee's admittedly "inaccurate" records and offered no evidence to rebut her claims); Solano v. A Navas Party Production, Inc., 728 F. Supp. 2d 1334, 1343-44 (S.D. Fla. 2010) (Defendant agreed time records showed certain weeks where plaintiff worked 70 hours).

Significantly, however, a plaintiff may not rely on "speculation."  See, e.g., Ihegword v. Harris County Hospital District, 555 F. App'x 372, 375 (5th Cir. 2014) ("an unsubstantiated and speculative estimate of uncompensated overtime does not constitute evidence sufficient to show the amount and extent of that work as a matter of just and reasonable inference"); Brand v. Comcast Corp., ____ F. Supp. 3d ____, 2015 WL 5693659 (N.D. Ill., Sept. 28, 2015) (finding testimony that

plaintiff only took lunch breaks maybe once, twice, or three times a month or 75% of the time to be insufficient even under "relaxed 'just and reasonable inference' evidentiary standard" noting that plaintiffs had not provided any explanation for how they reached their estimates); Gatto v. Mortg. Specialists of Ill., Inc., 442 F. Supp. 2d 529, 535-36 (N.D. Ill. 2006) (employee failed to produce any evidence that she worked over 40 hours per week in any week she was employed and statement that employee worked more than 40 hours per week "nearly every week" not sufficient to create genuine issue of fact).

Childress must prove the amount and extent of overtime worked as a matter of "just and reasonable inference."  Childress was scheduled to work Monday through Thursday from 8:30 a.m. until 4:00 p.m. with Fridays off and being on-call every other Saturday.  This schedule generally allowed for 30 - 35 hours of work per week.  Childress would have to show over an additional five to ten hours of work per week to be entitled to overtime.

Significantly, Childress has not provided any evidence of specific hours that she worked and was not paid.  She has not attempted to break down dates and times for unpaid overtime.  Childress refers to "flyers" that were distributed showing "Grady's" attendance at certain weekend functions promoting child car seat safety.  However, there is nothing to show that Childress, herself,

71

represented Grady at each of these particular events.   Nor has Childress contended that the flyers she presented are the totality of weekend events she attended rather than simply a representative sample.   Furthermore, both Childress and Everett testified that the time spent at these weekend events could vary depending on where they were held and how much set up and clean up had to be done.   Childress did testify that she participated in a weekly telephone conference all on Friday mornings.

Childress agrees that her actual on-call hours worked would be recorded because she had to swipe her badge to enter the building.   There is no dispute that Grady's timekeeping system recorded Childress's actual hours worked on site at the hospital.   Childress has not testified as to any hours that she returned to the hospital but did not swipe her card.[8]   Thus, the only possible unaccounted for hours would have to come from meals, off-the-clock work, or weekend hours.

Childress repeatedly testified in her deposition that she did not have any documentation that would show when she worked more than 40 hours per week, that she had not made an estimate of the number of overtime hours she worked,

---

[8]Childress does refer to six weekends days in 2012 where she claims she was not paid for actual on call work.  However, the Court has already determined that the two year statute of limitations applies and therefore, 2012 is no longer relevant to Childress's claims.

and that she could not identify the specific weeks in which she contends she was entitled to overtime payment.  See Doc. No. [70], p. 6.  The situation is additionally complicated by the fact that Childress is only scheduled to work 30 - 35 hours per week and thus would have to work five to ten hours of additional time in order to reach the 40 hour threshold.  For all of these reasons, the Court concludes that Childress has not proffered sufficient evidence from which a jury could conclude the amount and extent of this overtime work as a matter of "just and reasonable inference."

However, Grady admits that its own time records reflect that Childress did work over time for a certain number of weeks in 2013 (total of 25:11 hours overtime) and 2014 (total of 21:43 hours overtime).  See Doc. No. [61], pp. 21-23. Childress does not dispute these hours, but only contended that there were additional hours of overtime unaccounted.  The Court has found above that Childress cannot show those additional hours by a means of just and reasonable inference.  But Childress is entitled to overtime damages for those hours which Grady admits were in excess of forty per week.

### 5.   Calculation of Damages (Fluctuating Work Week)

Section 7(a)(1) of the FLSA requires that employers compensate their employees for hours worked in excess of forty "at a rate not less than one and

one-half times the regular rate at which [they are] employed." 29 U.S.C. § 207(a)(1).  If the employer does not do so, it is liable to employees for their "unpaid overtime compensation." Id., § 216(b).  The term "regular rate" is not defined under the Act, but it is the "keystone" of Section 7(a).  See Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424 (1945) ("On that depends the amount of overtime payments which are necessary to effectuate the statutory purposes.  The proper determination of that rate is therefore of prime importance.").

The Court finds Urnikis-Negro v. American Family Property Services, 616 F.3d 665 (7th Cir. 2010), to be instructive on the method of calculating overtime damages in a case where an employer misclassifies a non-hourly employee as exempt. There, at a bench trial, the district court held that the employer misclassified the plaintiff as exempt. The district court then used the "fluctuating work week" method (as set forth in 29 C.F.R. § 778.114(a)) to calculate the overtime damages owed to the plaintiff.

On appeal, the Seventh Circuit discussed what "regular rate" meant under the Act.  Citing to regulations, the court found that "an employee's regular rate of pay is the amount of compensation he received per hour." Id. at 673 (citing 29 C.F.R. § 778.109).  Further, "although the regular rate of pay is expressed in terms

74

of an hourly wage, employees may, in practice, be paid in a variety of other ways: 'their earnings may be determined on a piece-rate, salary, commission or other basis, but in such case the overtime compensation due to employees must be computed on the basis of the hourly rate derived therefrom and, therefore, it is necessary to compute the regular hourly rate of such employees during each workweek." <u>Id.</u>  For the purposes of overtime calculation, the "weekly salary must be . . . divided 'by the number of hours which the salary is intended to compensate.'" <u>Id.</u> (citing 29 C.F.R. § 778.113(a)).

In <u>Urnikis-Negro</u>, however, the plaintiff was not hired to work a specific numbers of hours per week.  Her hours were indeterminate and "routinely" exceeded forty. <u>Id.</u> at 674.  The Seventh Circuit found that in <u>Overnight Motor Transportation Co. v. Missel</u>, 316 U.S. 572 (1942), <u>superseded on other grounds by statute as stated in</u> <u>Trans World Airlines, Inc. v. Thurston</u>, 469 U.S. 111, 128 n.22 (1985), the Supreme Court held that  "when an employee is, by agreement, paid a fixed weekly wage for hours that fluctuate from week to week, the proper way to calculate the employee's regular rate of pay is to divide the weekly wage by the number of hours actually worked in a particular week." <u>Id.</u> (citing <u>Missel</u>, 316 U.S. at 580).

The <u>Urnikis-Negro</u> court further explained that

> [n]otably, the approach taken by the Court in <u>Missel</u> treats the fixed weekly wage paid to the employee as compensation at the regular rate for <u>all</u> hours that the employee works in a week, including overtime hours.  The employer will separately owe the employee a premium for the overtime hours, but because he has already been compensated at the regular rate for the overtime hours by means of the fixed wage, the employer will owe him only one-half of the regular rate for those hours rather than time <u>plus</u> one-half.

<u>Id.</u> at 675 (emphasis in original).  Because the employee works a variable number of hours per week, the regular rate of pay will also vary per week.  The greater number of hours the employee works, the less his regular rate of pay will be.  The overtime premium also "rises and falls" with the total number of hours worked each week.  <u>Id.</u>

The Seventh Circuit further noted that <u>Missel</u>'s method of calculating overtime pay for employees with a fixed salary but whose work hours fluctuate was "incorporated" into an "interpretive rule promulgated by the Department of Labor." <u>Id.</u> (citing 29 C.F.R. § 778.114).  Section 778.114 describes under what circumstances an employer might use the fluctuating work week method of compensation.  <u>Urnikis-Negro</u>, however, rejected the retrospective application of § 778.114 to misclassification cases, finding that the rule was not meant to be remedial and that in misclassification cases, certain elements of the rule would not have been satisfied.  <u>Id.</u> at 677-78.  Nonetheless, the court found that it "still

must ascertain the employee's regular rate of pay and calculate an appropriate overtime premium based on that rate." Id. at 679.

Although the court noted that some courts assumed a weekly fixed salary was intended to cover solely forty hours, that "presumption cannot be irrebuttable" and "where the employee and the employee have in fact agreed that a fixed weekly salary will constitute payment at the regular rate for any and all hours worked – which Missel recognizes they are free to do . . . – there is no factual basis for deeming the salary to constitute straight-time compensation for 40 hours alone." Id. at 680. The fact that the employer has failed to comply with the FLSA in not paying overtime does not "alter the employee's regular rate of pay, which under Missel turns on what the parties agreed the employee would be paid for the hours he actually worked." Id.

Once the court determines that the employer and employee agreed that the weekly wage was intended to compensate the employee for any and all hours she worked in that week, Missel controls how the regular rate of pay must be calculated. Id. at 681. Missel holds that "the employee's regular rate of pay for a given week is calculated by dividing the fixed weekly wage by the total number of hours worked in that week. . . . The employee is then entitled to an overtime premium of one-half that rate." Id.

77

In addition to Urnikis-Negro, several other circuits have approved the one-half rate for overtime damages under similar circumstances.  See, e.g., Black v. SettlePou, P.C., 732 F.3d 492, 498 (5th Cir. 2013) (citing Blackmon v. Brookshire Grocery Co., 835 F.2d 1135 (5th Cir. 1988)); Desmond v. PNGI Charles Town Gambling, L.L.C., 630 F.3d 351, 357 (4th Cir. 2011); Clements v. Serco, Inc., 530 F.3d 1224, 1230-31 (10th Cir. 2008); Valerio v. Putnam Assocs. Inc., 173 F.3d 35, 39 (1st Cir. 1999).

Although the Eleventh Circuit has not directly addressed this specific question,[9] it, too, has recognized that the key factor in determining the "regular rate" is what the employer and employee agree the pay was intended to compensate.  See Rodriguez v. Farm Stores Grocery, Inc., 518 F.3d 1259, 1269 (11th Cir. 2008) (citing to Department of Labor interpretative bulletin 29 C.F.R. § 778.113(a) explaining "regular rate" of pay).  In the "regular rate" ratio, the "divisor" is "the number of hours the employee's pay is intended to compensate – not necessarily the number of hours he actually works."  Id.  As such, in Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d 1299 (11th Cir. 2013), where

---

[9] In Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d 1299 (11th Cir. 2013), the Eleventh Circuit cited the reasoning of Urnikis-Negro with approval but noted that the fluctuating workweek method was "not the only or even the default method for calculating damages."  Id. at 1311.  The court then referred to the method of calculation used in Missel.

78

it was possible for the jury to determine that the employees' salaries were "intended to compensate all hours worked," the jury "should have determined that [the employees] were already partially compensated for their overtime hours at their regular rate of pay and merely awarded an overtime premium at half that rate." Id. at 1312.

Conceptually, Missel and its progeny explain that an employee is not entitled to time-and-a-half for overtime when the salary that he has already received has compensated him (albeit with no overtime premium) for all of the hours that he has worked. Under those circumstances, the employee is entitled only to the one-half premium for any hours that he worked in excess of forty.

Childress argues that Grady cannot ask for the application of the fluctuating work week because Grady never paid her overtime at the rate of one-half her regular rate of pay.[10] In other words, Childress contends that Grady may not ask the Court to apply the fluctuating work week formula retroactively. As the Court explained above, however, it need not apply the fluctuating work week formula "retroactively" to reach the same conclusion that Childress is entitled

---

[10]Childress also argues that it would be premature for the Court to make a ruling on the method of calculating damages because there has not yet been a determination that an FLSA violation occurred. See Doc. No. [64], pp. 13-14. Defendants, however, admit that Childress is entitled to at least some overtime payment based solely on Grady's timekeeping records.

only to an overtime premium of half her regular rate of pay. The question here is not whether Childress was compensated under the fluctuating work week plan. She clearly was not. The question is how are Childress's overtime damages – if any – to be calculated.

Determining the calculation of unpaid overtime is a mixed question of law and fact. See Ransom v. M. Patel Enterprises, Inc., 734 F.3d 377, 381 (5th Cir. 2013). The determination of the regular rate of pay is a question of fact, while the appropriate methodology to calculate the total amount owed is a question of law. Id.

This is a misclassification case. Childress was never paid as an hourly employee and clearly understood and accepted that what salary she received was to cover all of the hours she worked, particularly after the grant specifying 32 hours per week terminated. The employer and employee may agree as to a number of hours per week her salary is to cover. Or, as explained above, they may also agree that the salary is to cover all hours worked.

It is clear that neither Childress nor Grady considered Childress to be an hourly employee. As such, the Court looks to the manner in which the Department of Labor and the Supreme Court have approved the calculation of overtime damages for non-hourly employees. The most important consideration

80

is whether there was an agreement between employer and employee that the amount of compensation received by the employee would cover all hours worked by the employee.  There is no dispute of fact here based Childress's own testimony that she understood her compensation to cover all of the hours she worked.  As such, because Childress understood that she already received compensation for all hours worked, the only possible manner in which overtime compensation can be calculated is half-time.

The Court finds, therefore, any overtime damages Childress is entitled to would be computed by dividing Childress's weekly total earnings by the number of hours worked in that particular workweek to determine her "regular rate" of pay for that week.  Then, the number of hours Childress worked in excess of forty in that workweek is multiplied by one-half her "regular rate" to determine the overtime damages for that workweek.

Given that the Court has now determined that Childress cannot demonstrate by means of just and reasonable inference any additional overtime hours beyond that admitted to by Grady and the Court has ruled on the manner in which overtime hours are to be calculated, the Court DIRECTS to the parties to reach agreement as to the overtime damages owed to Childress based on the Court's rulings with respect to overtime hours and the means of calculating

81

overtime damages.  The parties are DIRECTED to submit notice of those hours and damages to the Court within twenty (20) days from the date of entry of this order.

### E.    FLSA Retaliation (Everett Only)

Plaintiff Everett contends that Defendants retaliated against her for filing an overtime lawsuit by "forcing" her on unrequested and unpaid leave that would expire before her baby was due.  The same factual allegations generally form the basis of Everett's claims for retaliation, Title VII Pregnancy Discrimination, and Americans with Disabilities Act claim.

The FLSA protects persons against retaliation for asserting their rights under the statute. See 29 U.S.C. § 215(a)(3). The anti-retaliation provision of the FLSA forbids employers: "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA] . . . ."  29 U.S.C. § 215(a)(3).

A prima facie case of FLSA retaliation requires a demonstration by the plaintiff of the following: (1) she engaged in activity protected under the FLSA; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action. See,

e.g., Miller v. Roche Sur. & Ca. Co., 502 F. App'x 891, 893 (11th Cir. 2012); Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342–43 (11th Cir. 2000) (internal citations omitted).

In demonstrating causation, the plaintiff must prove that the adverse action would not have been taken "but for" the assertion of FLSA rights. See Wolf, 200 F.3d at 1342-43. To satisfy the causation prong, the plaintiff can show close temporal proximity between the statutorily protected activity and the adverse employment action. See, e.g., Brungart v. BellSouth Telecomm., Inc., 231 F.3d 791, 798-99 (11th Cir. 2000). Mere temporal proximity, however, without more, must be "very close." See, e.g., Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001). "A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." See, e.g., Thomas, 506 F.3d at 1364; see also Brown v. Alabama Dep't of Transp., 597 F.3d 1160, 1182 (11th Cir. 2010).

"If the employer asserts a legitimate reason for the adverse action, the plaintiff may attempt to show pretext." See Wolf, 200 F.3d at 1343. More specifically, "[p]rovided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it."

83

Raspanti v. Four Amigos Travel, Inc., 266 F. App'x 820, 824 (11th Cir. 2008)

(citing Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir.2000) (en banc)).

Defendants concede Everett can demonstrate the first two elements of a prima facie case of retaliation.  As to the third element of causation, Everett filed her complaint on January 21, 2015, and she was allegedly "involuntarily" placed on Family Medical Leave Act on May 5, 2015, almost four months later. Moreover, less than one month after she filed her complaint, Everett, herself, applied for intermittent FMLA leave from February through August 2015, and Defendants granted that leave.  Based on the length of time between the filing of Everett's complaint and the alleged retaliation, as well as the fact that only one month after she filed her FLSA complaint, Defendants granted leave requested by Everett, the Court finds that Everett cannot establish the causation prong of her prima facie case of retaliation.

In the alternative, Defendants argue that even if Everett could show a prima facie case of retaliation, they had a legitimate non-discriminatory reason for placing Everett on FMLA – she could not perform the essential functions of her job.  The sole argument Everett offers is that this reason is pretextual is her opinion that she could perform the essential functions of her job even with the medical restrictions listed in her doctor's note.  Plaintiff offers the conclusory

argument that Defendants' reasoning is "unbelievable" and "lacks credibility." The Court is not persuaded.

There is no dispute that Everett's job duties included teaching classes, walking in the hospital to meet with patients, and carrying car seats to them. Furthermore, Everett's Job Description shows required activities to include lifting 25 pounds, and carrying, lifting, and pushing 25 to 44 pounds. See Everett Depo., Ex. 17, p. 4. The mere fact that Everett suggests that she did not have to perform all of those functions and could have other health educators take over those duties does not mean that the employer is wrong in determining that Everett could not fulfill her essential job duties with the medical restrictions listed by her doctor. It is not the role of the court to second guess business decisions so long as those decisions were not improperly motivated. See e.g., Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000); Elrod v. Sears, Roebuck & Co., 939 F.3d 1466, 1470 (11th Cir. 1991) ("[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions. . ."). Everett's simple disagreement with Defendants' assessment of her essential job requirements is not sufficient evidence from which a reasonable jury could conclude that Defendants placed her on leave in retaliation for filing an FLSA complaint.

This is true particularly as here where Everett has not offered any individual in similar circumstances who was permitted to work from home such that Defendants' decision here could be seen as pretext for retaliation. Moreover, when Grady offered Everett the option of returning to work with the listed medical restrictions in place, Everett declined because she did not want to jeopardize her health or her baby's health. Everett's own testimony, then, casts substantial doubt on her personal opinion of whether she could fulfill the essential duties of the job with her medical restrictions. For these reasons, the Court also finds Everett cannot show that Defendants' legitimate non-discriminatory reason for placing her on FMLA was pretext for retaliation.

The Court GRANTS Defendants' motion for summary judgment as to Everett's FLSA retaliation claim.

**F.     Title VII/Pregnancy Discrimination (Everett Only)**

As the Court explained above, Everett contends that Defendants discriminated on the basis of her pregnancy by (1) forcing her on unpaid medial leave when she informed Grady that she was pregnant, (2) refusing to permit her to temporarily work from home when she notified them of her medical condition related to pregnancy, and (3) when they retaliated against for her previous complaints in this case by refusing to permit her to work temporarily from home.

The Court has already determined that Everett cannot state a retaliation claim because she has not alleged that she engaged in the protected activity of complaining about pregnancy discrimination prior to the time any allegedly adverse employment actions were taken.  The Court also found above that Everett could not sustain her first claim as a separate and independent claim because two weeks after Grady first placed her on leave, she declined Grady's offer to return to work with the lifting and standing/walking restrictions. Finally, although Everett conceded that she cannot defeat Defendants' motion for summary judgment on her second claim, the Court finds that given the circumstances of Everett's concession, it would be judicially efficient to rule on the merits of Everett's second pregnancy discrimination claim.

Everett presented a doctor's note on June 16, 2015, stating that "patient is to work from home."  Defendants rejected this request stating that Everett's essential job duties required her to be at the hospital.  The result of Defendants' rejection was that Everett remained on FMLA leave and that leave was extended past her delivery and into her postpartum recovery until she returned to work at the beginning of October 2015.  Everett alleges Defendants discriminated against her on the basis of her pregnancy by refusing to permit her to work from home due to her medical condition related to her pregnancy.

87

Title VII provides that it is an unlawful employment practice for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . ." 42 U.S.C. § 2000e-2(a)(1). "In 1978, Congress enacted the Pregnancy Discrimination Act, 92 Stat. 2076, which added new language to Title VII's definitions subsection. The first clause of the 1978 Act specifies that Title VII's term 'because of sex' includes 'because of or on the basis of pregnancy, childbirth, or related medical conditions.'" Young v. UPS, Inc., ___U.S. ____, ____, 135 S. Ct. 1338, 1344-45 (2015) (internal quotation marks and ellipses omitted).  The Pregnancy Discrimination Act "makes it clear that it is discriminatory to treat pregnancy-related conditions less favorably than other medical conditions." Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 684 (1983).

In Young, the Court established a modified McDonnell Douglas framework, finding that a plaintiff could establish a prima facie case of pregnancy discrimination by "showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under

88

Title VII." Id. at 1354.  A plaintiff does this by showing (i) she belongs to a protected class, (ii) she sought an accommodation, (iii) the employer did not accommodate her, and (iv) "that the employer did accommodate others similar in their ability or inability to work." Id.  If a plaintiff satisfies the prima facie case, then the remainder of the McDonnell Douglas burden-shifting framework comes into play.

In Young, the Supreme Court found that even a facially neutral accommodation policy could give rise to an inference of pregnancy discrimination if it imposed a significant burden on pregnant employees that was not justified by the employer's non-discriminatory reason.  For example, Young found that a plaintiff could create a genuine issue of fact on "significant burden" by showing "that the employer accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers." Id.

Here, the Court finds that Everett cannot demonstrate a prima facie case because she has not proffered any similar non-pregnant employees similar in their ability or inability to work whom Grady did accommodate.  Moreover, even if she had demonstrate a prima facie case, for the same reasons as stated above, Everett has not shown that Grady's nondiscriminatory reasons for not permitting

her to work from home were pretextual.  The Court GRANTS Defendants'
motion for summary judgment as to Everett's pregnancy discrimination claim.

### G.    Americans with Disabilities Act (Everett Only)

Everett contends that Defendants violated the ADA by refusing her request
for reasonable accommodation of working from home due to her high-risk
pregnancy and medical condition of incompetent cervix. The Americans with
Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 et seq., provides in
relevant part that "[n]o covered entity shall discriminate against a qualified
individual on the basis of disability in regard to job application procedures, the
hiring, advancement, or discharge of employees, employee compensation, job
training, and other terms, conditions, and privileges of employment." 42 U.S.C.
§ 12112(a).

The Eleventh Circuit has held that the burden-shifting framework
articulated in McDonnell Douglas does not apply to reasonable accommodation
cases under the ADA.  See Nadler v. Harvey, 2007 WL 2404705, at *9 (11th Cir.
Aug. 24, 2007); Holly v. Clairson Industries, L.L.C., 492 F.3d 1247, 1262 (11th Cir.
2007) (holding in ADA reasonable accommodation case that there are no
additional burdens on defendant to show it had legitimate nondiscriminatory
reason for terminating plaintiff or on plaintiff to show defendant's proffered

reasons were pretextual).[11]   Rather, the Eleventh Circuit holds that the "burden shifting analysis of Title VII employment discrimination claims is **partially** applicable to ADA claims. . . .   As such, once the plaintiff establishes a prima facie case of discrimination, the burden of production shifts to the employer to demonstrate undue hardship. . . .   Unlike in Title VII cases, however, the plaintiff has no subsequent burden to demonstrate pretext." Abram v. Fulton County Government, 598 F. App'x 672, 676 (11th Cir. 2015) (emphasis added).

To establish a prima facie case of discrimination under the ADA, as amended, a plaintiff must show: (1) he is disabled, (2) he is a qualified individual, and (3) he was subjected to unlawful discrimination because of his disability.

---

[11]Admittedly, the clarity of the law on this point has been hampered to a certain extent by the fact the Eleventh Circuit declared this rule in Nadler, an unpublished opinion.  Later cases appear still to apply the McDonnell Douglas framework to reasonable accommodation cases.  See, e.g., Calvo v. Walgreens Corp., 340 F. App'x 618, 621 (11th Cir. 2009) (stating it was applying framework in reasonable accommodation case, but this case could be characterized as discipline action rather than reasonable accommodation case)

Further, while McDonnell Douglas does not apply to reasonable accommodation cases which presumably do not address issues of intent, it does still apply to other disparate treatment ADA cases.  Those cases apply McDonnell Douglas without particular note of the reasonable accommodation exception.  See, e.g., Smith v. Federal Exp. Corp., 191 F. App'x 852, 854 (11th Cir. 2006) (citing Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1226 (11th Cir. 1999) ("The same burden-shifting analysis under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973), applicable to other employment discrimination suits applies to ADA claims.")).

Hilburn, 181 F.3d at 1226.  Under the ADA, the term "disability" means, with respect to an "individual . . . (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  "An individual may establish coverage under any one or more of these three prongs of the definition of disability . . . ." 29 C.F.R. § 1630.2 (g)(2) (2011).

A qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8); see also Holly, 492 F.3d 1256; 29 C.F.R. § 1630.2 (m) ("The term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position.").

That is, an "ADA plaintiff must show either that he can perform the essential functions of his job without accommodation, or, failing that, show that he can perform the essential functions of his job with a reasonable accommodation."  D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1229 (11th

92

Cir. 2005) (quotations and citations omitted).  "If the individual is unable to perform an essential function of his job, even with an accommodation, he is, by definition, not a 'qualified individual' and, therefore, not covered under the ADA.  In other words, the ADA does not require [the employer] to eliminate an essential function of [the plaintiff's] job." Id. (quotations and citations omitted).

The "essential functions" of the job means the "fundamental job duties" and "does not include the marginal functions of the position."  Id. at 1230. "Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors." Id. (quotation and citation omitted); see also Samson v. Federal Express Corp., 746 F.3d 1196, 1200-01 (11th Cir. 2014).  "In making this determination, the statute provides, 'consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.'" D'Angelo, 422 F.3d at 1230 (quoting 42 U.S.C. § 12111(8)); see also Lucas v. Gainger, 257 F.3d 1249, 1255 (11th Cir. 2001).  A job function may be deemed essential inter alia if "there are a limited number of employees available among whom the performance of the job function can be distributed." D'Angelo, 422 F.3d at 1230. "Other relevant factors include the

amount of time an employee spends performing the function and the consequences of not requiring the employee to perform the function." Abram, 598 F. App'x at 677.

Finally, a plaintiff must show he was subject to unlawful discrimination because of his disability.  Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). The "burden of identifying an accommodation that would allow a qualified individual to perform the job rests with that individual, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable. Once the plaintiff has met her burden of proving that reasonable accommodations exist, the defendant-employer may present evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer." Terrell v. USAir, 132 F.3d 621, 624 (11th Cir. 1998) (internal citations and quotations omitted).  That is, if an employee never identifies a reasonable accommodation, the employer would not be required to prove an "undue

burden."   Holly, 492 F.3d at 1262 n.15; Abram, 598 F. App'x at 677 ("The employee is not necessarily entitled to the accommodation of her choice.").[12]

The "ADA provides no cause of action for failure to investigate possible accommodations." McKane v. UBS Fin. Servs., Inc., 363 F. App'x 679 681-82 (11th Cir. 2010); Willis v. Conopco, Inc., 108 F.3d 282, 285 (11th Cir. 1997) (ADA does not "require an 'interactive process' such that an employer can be held liable merely for failing to engage in the process itself (regardless of whether a 'reasonable accommodation' could in reality have been made for the employee)"); Moses v. American Nonwovens, Inc., 97 F.3d 446, 448 (11th Cir. 1996) (where plaintiff cannot demonstrate "reasonable accommodation" employer's lack of investigation into reasonable accommodation unimportant).

An accommodation is "reasonable" if it leads to "[m]odifications or adjustments to the work environment, or to the manner of circumstances under which the position held or desired is customarily performed, [thereby] enabling a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).  Reasonable accommodations might be

---

[12]Here, Defendants' argument is that Everett never identified any accommodation that would allow her to perform the essential functions of her job. As such, the analysis never proceeds to the point where Defendants would argue that the accommodation suggested would be an "undue burden" on Defendants.

"[j]ob restructuring [and] part-time or modified work schedules." 29 C.F.R. § 1630.2(o)(2)(ii).  An employer to not required to provide an employee with her desired accommodation, but rather only must provide a reasonable accommodation. See, e.g., Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1285-86 (11th Cir. 1997).  A leave of absence might be a reasonable accommodation in some cases.  See, e.g., Moore v. Accenture, LLP, 2007 WL 3313152 (11th Cir. Nov. 9, 2007).

For the purposes of this motion, the parties assume Everett can establish she was disabled.  Defendants contend Everett is not a "qualified individual" because she cannot perform the essential functions of her job with or without a reasonable accommodation.  Everett responds that Defendants never engaged in the informal process to identify reasonable accommodations required under Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1286 (11th Cir. 1997).

The Court disagrees that the informal process never occurred.  Everett, herself, argues that her counsel requested three times that she be permitted to work from home full time and Grady responded that she had to be at the hospital to perform her essential job functions.  Engaging in the process does not require the employer to agree to the only accommodation the employee requests, no

matter how many times the employee requests the same accommodation. Defendants do not argue that working from home is never a reasonable accommodation or that conducting some work from home might not be a reasonable accommodation. Rather, they contend that Everett could not perform the essential functions of her job at Grady Hospital by working from her home full time which is the accommodation she requested.

The fact Everett argues that other employees could have covered for her with respect to those duties that had to take place at the hospital does not make her requested accommodation reasonable. See Treadwell v. Alexander, 707 F.2d 473, 478 (11th Cir. 1983) ("[C]ourts have universally found that employers are not required to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability.").

The Court also does not agree with Everett's argument that "teleworking" is required in Everett's job description and therefore her request was reasonable. There has never been any evidence in the record of this case that Everett's job "required" her to work from home all of the time. The job description only states that flexibility on location of work given that it is likely Everett would be called

97

at home during on-call duty.  The need to sometimes handle work matters after hours is vastly different than a request to work full time from home.

The gravamen of Everett's argument, again, is that in her opinion, she could do her work at home and the other health educators could do her hospital work while she was at home.  The employer is not required to accept the employee's view of the situation.  Everett agrees that her primary duties include distributing car seats; administering the Grady car seat program, directing and providing administrative leadership, developing program materials, attending management meetings at Grady, assigning duties, supervising Donna Childress and program volunteers, preparing reports, seeking grants, and conducting educational activities.  Everett also agrees that at least some of those duties would have to be assumed by other employees if she were to work full time from home.  The Court finds that Everett's requested accommodation of full time work from home goes beyond modifications to her work schedule or adjustments to her work environment.  Given the circumstances of Everett's work situation, the Court finds that Everett's request of full time work from home was not a reasonable accommodation.  The Court GRANTS Defendants' motion for summary judgment as to Everett's ADA discrimination claim.

AO 72A
(Rev.8/82)

### III.    Conclusion

The Court GRANTS IN PART AND DENIES IN PART Defendants' motion for partial summary judgment as to Plaintiff Childress's claims [61]; GRANTS Defendants' motion for summary judgment as to Plaintiff Everett's claims [62]; GRANTS Plaintiff Childress's motion for leave to file response [77]; GRANTS Plaintiff Everett's motion for leave to file sur-reply [80]; and GRANTS Plaintiff Everett's motion for leave to file response [81].

The Court DIRECTS to the parties to reach agreement as to the overtime damages owed to Childress based on the Court's rulings with respect to overtime hours and the means of calculating overtime damages.   The parties are DIRECTED to submit notice of those hours and damages to the Court within twenty (20) days from the date of entry of this order.


**IT IS SO ORDERED** this 12th day of May 2016.


s/Steve C. Jones
HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)